633 A.2d 932

**Ronald T. HOLMES, et al.**

v.

**COVERALL NORTH AMERICA, INC., et al.**

**No. 458, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Dec. 8, 1993.

Eliot G. Striar, Columbia, for appellants.

C. Torrence Armstrong (Frederick P. Helm, McGuire, Woods, Battle & Boothe, Alexandria, VA, Morton A. Sacks,

Gerard G. Magrogan, McGuire, Woods, Battle & Boothe, Baltimore, Arthur G. House and Hadley, House & Rabin, Bethesda, on the brief), for appellees.

Argued before BISHOP, FISCHER and CATHELL, JJ.

BISHOP, Judge.

Appellants, Ronald T. Holmes ("Holmes") and Holmestar Corporation doing business as Coverall of Baltimore, Inc. ("Holmestar"), filed a complaint in the Circuit Court for Howard County against Appellees, Coverall North America, Inc. ("Coverall"), Shahyar Alex Zayanderoudi also known as Alex Roudi ("Roudi"), and the attorney and other individual officers, directors, and employees of Coverall, alleging violations of the Maryland Franchise Act (Count I), fraud in the inducement (Count II), negligent misrepresentation (Count III), and professional malpractice (Count IV). Coverall then filed a Petition for Order of Arbitration and for Stay of Action Pending Arbitration or for Dismissal of Action. The trial court granted the petition and ordered that the case be submitted to arbitration pursuant to the franchise agreement and that the action be stayed pending the outcome of arbitration.

Appellants filed a Motion to Alter or Amend Judgment along with a Petition to Stay Arbitration. The trial court struck its order compelling arbitration, and instead, granted Appellants' Petition to Stay Arbitration. Coverall then filed a Request for Clarification of the court's order. In response to that request, the trial court reinstated its original order staying the action and ordering that arbitration proceed in accordance with the franchise agreement. Appellants filed a timely notice of appeal to this Court.

Upon Appellees' motion, we dismissed Appellants' appeal pursuant to Rule 8–602(a)(1) because the court's order was not a final appealable judgment. Appellants then filed a Petition for Writ of Certiorari, which the Court of Appeals granted. The Court of Appeals, in a *per curiam* order, vacated this

Court's judgment and remanded the case for consideration of the merits of the appeal, 330 Md. 114, 622 A.2d 744.

## *Issues*

Appellants raise three issues, which we shall consolidate into the following two issues:

I. Whether the circuit court erred when it ordered arbitration and stayed the action.

II. Whether the legislative findings and intent enunciated in the Maryland Franchise Act, and the judicial powers and civil rights and remedies granted in that Act, compel the conclusion that the circuit court exceeded its jurisdiction when it ordered arbitration and stayed the action.

## *Facts*

In the case *sub judice,* the trial court ordered arbitration and stayed the underlying action pending the outcome of arbitration, based solely on the averments in Appellants' complaint, Coverall's petition, and Appellants' response to that petition. The trial court did not conduct a hearing, and the parties did not supply the court with affidavits or a stipulation of facts. Because the trial court's function in ruling on Coverall's petition was similar to the function performed by a court when considering a motion to dismiss, we shall "assume the truth of all well-pleaded facts in [Appellants'] complaint, as well as inferences which may reasonably be drawn from those well-pleaded facts[,]" when determining whether the court erred when it ordered arbitration and stayed the action. *Lee v. Denro, Inc.,* 91 Md.App. 822, 828, 605 A.2d 1017 (1992). We shall also consider those facts included in Coverall's petition that Appellants admitted in their response.

Coverall is engaged in the business of offering and selling franchises related to commercial janitorial and building cleaning services. In October 1987, Holmes read an advertisement for Coverall franchises in a magazine and wrote for and received material about the company. Holmes had several conversations with Roudi—Coverall's president, chief financial

officer, and sole shareholder—and visited two Coverall regional franchises and the Coverall headquarters in San Diego, California.

During the trip to San Diego, Roudi gave Holmes comparison costs and profit projections for several future Coverall franchise sites, including Baltimore. Based on those business forecasts and other data about the franchise that Coverall provided, Holmes decided to purchase a Coverall franchise in the Baltimore area.

On February 22, 1988, Holmes met with Roudi in Coverall's Philadelphia office, signed a Coverall service franchise agreement ("the Agreement") to purchase a Coverall franchise in Maryland, and gave Roudi a check for $10,000 as a deposit for the franchise. The Agreement provided for the payment of a $140,000 franchise fee, together with monthly royalty payments of up to four percent of gross revenues and monthly business development fees of one and one-half percent of gross revenues, beginning in the sixth month of franchise operations. The Agreement also contained the following relevant provisions:

11. *Franchisee's Obligations Upon Termination*

 * * * * * *

 B. The termination of this Agreement for any reason shall not be deemed to release the Franchisee from any and all sums due or to become due hereunder or from its obligations regarding noncompetition and such other obligations as set forth herein.

 * * * * * *

20. *Arbitration*

 Any claim or controversy arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration, in accordance with the rules then prevailing of the American Arbitration Association. The parties agree that the arbitrator or arbitrators may grant injunctive relief as well as damages to the prevailing party. Judgment upon an

award by the aforementioned arbitrator(s) filed in a court of competent jurisdiction shall be binding.

On March 15, 1988, Holmes paid Roudi an additional $48,000 and signed an $82,000 promissory note payable to Coverall. In late March or early April 1988, Holmes met with Roudi in Baltimore and Roudi helped him negotiate a lease for office space in Jessup, Maryland. On April 23, 1988, Holmestar—a corporation established by Holmes—signed the lease. Operations were scheduled to begin on May 23, 1988, but when the space was not ready on time, the opening of the franchise office was delayed until July 1, 1988.

On July 6, 1988, Roudi arrived in Baltimore to train Holmes in the operations of the franchise. On July 12, 1988, Roudi told Holmes:

We have to have some more paperwork signed. Since the Maryland office did not open on time, you have to sign a new agreement because that's what the girl uses to put the information into the computer. We have to change your completion of training and agreement dates. Otherwise, if she enters the information from the old agreement (i.e. the agreement signed on February 22, 1988) into the computer they will start billing you for the loan payments and royalties on October 10, 1988, instead of January 10, 1989.

On July 12, 1988, based on Roudi's representations and at his request, Holmes signed a new agreement to purchase a Coverall franchise in Maryland and gave it to Roudi. At the same time, Roudi told Holmes to give him a "new check" for $58,000, and Roudi, in turn, returned the $58,000 that Holmes had previously paid him in February and March 1988. Holmes subsequently obtained a copy of the second franchise agreement from Roudi and noticed that Roudi had dated the agreement May 12, 1988, not July 12, 1988.

Approximately a year later, Holmes learned for the first time that the Maryland Securities Commissioner did not approve the Coverall offering prospectus for Maryland until May 6, 1988, and thus, Coverall had not been registered to sell franchises in Maryland as required by Art. 56, § 347(a) when

it sold a service franchise to Holmes on February 22, 1988. This information had not been disclosed to Holmes when he signed the second franchise agreement. In addition, Holmes contends that Roudi and Coverall should have offered to rescind the Agreement and return the partial franchise fee of $58,000 and all other monies Appellants paid, or to make restitution to Appellants for damages they sustained as a result of the transaction, but they did not do so. On August 3, 1989, Coverall terminated the Agreement as a result of Holmestar's default thereunder. On August 14, 1989, Appellants notified Coverall that, due to Coverall's violations of the Maryland Franchise Act, Holmestar was rescinding the Agreement. Holmestar then assigned and transferred to Coverall all of its contracts, leases, and assets. To date, Coverall has failed to reimburse and compensate Appellants for moneys paid and damages proximately sustained in connection with the Agreement transaction.

### *Discussion*

### I

In *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 103–04, 468 A.2d 91 (1983), the Court of Appeals summarized the law of arbitration in Maryland:

Arbitration is the process whereby parties voluntarily agree to substitute a private tribunal for the public tribunal otherwise available to them. Arbitration is a matter of contract which the parties should be allowed to conduct in accordance with their agreement. A party cannot be required to submit any dispute to arbitration that it has not agreed to submit.

The Maryland Uniform Arbitration Act ... embodies a legislative policy favoring enforcement of executory agreements to arbitrate. In accord with this legislative policy, the Act strictly confines the function of the court in suits to compel arbitration to the resolution of a single issue—is there an agreement to arbitrate the subject matter of a particular dispute. Where the language of the arbitration

clause is clear, and it is plain that the dispute sought to be arbitrated falls within the scope of the arbitration clause, arbitration should be compelled. If it is apparent, on the other hand, that the issue sought to be arbitrated lies beyond the scope of the arbitration clause, the opposing party should not be compelled to arbitration, since there is no agreement to arbitrate. Where there is a broad arbitration clause, calling for the arbitration of any and all disputes arising out of the contract, all issues are arbitrable unless expressly and specifically excluded.

(Citations and footnote omitted).

■ Appellants contend that the trial court erred when it ordered arbitration and stayed the action because it failed to consider a threshold issue—whether there exists between the parties a valid and enforceable arbitration clause. Specifically, Appellants argue that, because they elected to rescind the Agreement due to various violations of the Maryland Franchise Act, Md.Ann.Code art. 56, §§ 345–365D (1988) (now entitled the Maryland Franchise Registration and Disclosure Law and codified in Md.Bus.Reg.Code Ann. §§ 14–201 to –233 (1992 & Supp.1993)), and because grounds exist for the trial court to order that Coverall rescind the Agreement, *see id.* § 365(b), the trial court, not the arbitrator, should decide whether the Agreement exists. We disagree.

The Maryland Uniform Arbitration Act, Md.Cts. & Jud. Proc.Code Ann. (hereinafter "CJ") §§ 3–201 to –234 (1989), contains the following provisions relevant to the disposition of this appeal:

§ 3–206. **Validity of arbitration agreements**....

(a) *Validity.*—A ... provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract.

§ 3–207. **Order to arbitrate.**

(a) *Refusal to arbitrate.*—If a party to an arbitration agreement ... refuses to arbitrate, the other party may file a petition with a court to order arbitration.

(b) *Denial of existence of arbitration agreement.*—If the opposing party denies existence of an arbitration agreement, the court shall proceed expeditiously to determine if the agreement exists.

(c) *Determination by court.*—If the court determines that the agreement exists, it shall order arbitration. Otherwise it shall deny the petition.

§ 3–208. **Stay of arbitration.**

(a) *Petition to stay.*—If a party denies existence of the arbitration agreement, he may petition a court to stay commenced or threatened arbitration proceedings.

* * * * * *

(c) *Determination of existence of arbitration agreement.*—If the court determines that existence of the arbitration agreement is in substantial and bona fide dispute, it shall try this issue promptly and order a stay if it finds for the petitioner. If the court finds for the adverse party, it shall order the parties to proceed with arbitration.

Appellants cite three cases, *Crown Oil & Wax Co. v. Glen Constr. Co.,* 320 Md. 546, 557–58, 578 A.2d 1184 (1990); *Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.,* 313 Md. 652, 661, 547 A.2d 1048 (1988); and *Bel Pre Medical Ctr., Inc. v. Frederick Contractors, Inc.,* 21 Md.App. 307, 320, 320 A.2d 558 (1974), *rev'd on other grounds,* 274 Md. 307, 334 A.2d 526 (1975), each of which support the proposition (either directly or tangentially) that a court must determine, before ordering arbitration under CJ § 3–207(c), whether an agreement to arbitrate exists between the parties. Appellants then suggest that this same rule applies when, as in this case, the validity and enforceability of the Agreement, *which admittedly contains an arbitration agreement,* is in dispute. Appellants argue that, under *Petals Factory Outlet v. EWH & Assocs.,* 90 Md.App. 312, 600 A.2d 1170 (1992), rescission of

the Agreement is a "threshold issue" that must be resolved by the court prior to arbitration. We disagree.

In *Petals*, the appellant and the appellee entered into a lease that contained a broad arbitration clause. Under the lease, the appellant was permitted to assign the lease to its subsidiary corporation, whereupon the appellant would have no further responsibility under the lease. The appellant assigned the lease to its subsidiary, and then a dispute arose between the subsidiary corporation and the appellee. The appellee petitioned the circuit court to order that the appellant submit to arbitration. The appellant, however, argued that there had been a novation of the lease, completely releasing the appellant from the lease. The appellee denied that there had been a novation of the lease and contended that resolution of the question of whether a novation had occurred should be determined by the arbitrator, not the court. The circuit court granted summary judgment in favor of the appellee, and we reversed.

We cited *Crown Oil & Wax Co.* and *Stephen L. Messersmith, Inc., supra*, and held that a contention that there has been a novation of a contract "is precisely the type [of] "threshold issue" to be resolved by the court before referring the case to the arbitrator. Our conclusion is a natural extension of prior Maryland case law." *Id.* at 317, 600 A.2d 1170. We also relied on decisions of our sister states, including *Goebel v. Blocks & Marbles Brand Toys, Inc.*, 568 N.E.2d 552 (Ind.Ct.App.1991). *Goebel*, however, supports Coverall's position—that the issue of rescission of the underlying contract is not a threshold issue, but is rather an issue that the arbitrator should consider. The following passage from *Goebel* is instructive:

> The Court of Appeals of Arizona interpreted the term "grounds in equity or law for revocation of a contract", which term is contained in an Arizona statute ... which is nearly identical to [the Indiana statute]. Relying on the Supreme Court's holding in *Prima Paint Corporation v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395 [87 S.Ct. 1801, 18 L.Ed.2d 1270] ... (1967), that arbitration clauses,

except where the parties intend otherwise, are separable from the contracts within which they are located, the Court of Appeals of Arizona held that the term "grounds for revocation" "refers to grounds alleged with respect to the formation of the arbitration agreement itself, not the underlying contract." Thus, a question of whether an arbitration agreement ever was made or a question of whether the arbitration clause was repudiated is a question for a court.... Furthermore, "a trial court cannot properly refuse to compel arbitration on grounds of an alleged breach unless the arbitration clause itself has been repudiated." ... As the court noted:

"[T]he very purpose of arbitration provisions would be defeated and their effectiveness severely limited if a party were held to have abandoned his arbitration rights merely because his actions might be construed to constitute a breach of the contract prior to the time he seeks a clarification of those rights through arbitration."

"Grounds in equity or law for revocation of a contract include an allegation that the contract is void for lack of mutual consent, consideration or capacity or voidable for fraud, duress, lack of capacity, mistake, or violation of a public purpose." A question whether there has been a novation of a contract is similarly a "threshold issue of whether a contract and the making of an agreement to arbitrate existed with regard to the dispute between the parties." Thus, a contention that there has been a novation of a contract is for a court to decide.

In contrast to such threshold issues regarding the making of a contract are issues *arising after formation of a contract and agreement to arbitrate,* such as contentions of fraud in the inducement, waiver, and termination of contract. Those are issues which should be referred to an arbitrator.

\* \* \* \* \* \*

Questions of constructive fraud, abandonment, *rescission*, and repudiation ... were all questions for an arbitrator to decide.

568 N.E.2d at 556–57 (citations omitted and emphasis added). Thus, the Indiana Court identified two distinct categories of issues:

(1) issues relating to the formation of the arbitration agreement, which should be decided by the court, such as a claim of novation, or an allegation that the agreement is void for lack of mutual consent, consideration, or capacity, or voidable for fraud, duress, lack of capacity, mistake, or violation of a public purpose; and,

(2) issues arising after the formation of the arbitration agreement, which should be referred to arbitration, such as rescission, fraud in the inducement, waiver, and termination of the contract.

■ Further, in *Mendez v. Trustees of Boston Univ.*, 362 Mass. 353, 285 N.E.2d 446, 448 (1972), the Supreme Judicial Court of Massachusetts observed that the "termination of a contract, whether by rescission according to its terms, by abandonment, by termination for justifiable cause, or otherwise, does not necessarily terminate a provision for arbitration.... *Such a provision should be construed as broadly as the parties intended.*" (Emphasis added). This results because, ordinarily, "[a]n arbitration clause is separable from the contract in which it is embedded." *Municipal Energy Agency v. Big Rivers Elec. Corp.*, 804 F.2d 338, 342 (5th Cir.1986); *see also* 6 C.J.S. *Arbitration* § 8 (1975).

In the case *sub judice*, Appellants allege that they rescinded the Agreement by letter of August 14, 1989. Appellants also argue that, because of Coverall's numerous violations of the Maryland Franchise Act, the trial court may, pursuant to Art. 56, § 365(b), order Coverall to rescind the Agreement and make restitution to Appellants. In *Petals*, the appellant argued that, because the parties intended that it be discharged of its obligations under the lease upon assignment to the appellant's subsidiary, the arbitration provision of the lease

did not apply to the dispute between the appellant (the assignor) and the appellee. Unlike the claim of novation in *Petals*, Appellants' claim for rescission relates to events *extrinsic* to the formation of the contract; the parties to the Agreement clearly intended that the arbitration clause apply to the Appellants' claims for rescission of the Agreement and damages. Thus, *Petals* is inapposite.

Before its 1992 repeal and reenactment, the Maryland Franchise Act provided:

### § 365. Civil liability.

(a) *Circumstances under which person is liable.*—A person is civilly liable to the person buying or granted a franchise from him if he:

(1) Offers or sells a franchise [without first registering the offer of the franchise with the Securities Commissioner in the Office of the Attorney General]; or

(2) Offers or sells a franchise by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, the franchisee not knowing of the untruth or omission, and if the franchisor does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission.

\* \* \* \* \* \*

(b) *Right of franchisee to sue; relief granted.*—A person who has brought or been granted a franchise may sue under this section either at law or in equity to recover the damages sustained by reason thereof. *The court may order the franchisor or subfranchisor to rescind any franchise and to make restitution to the person who purchased or was granted a franchise.*

Md.Ann.Code art. 56, § 365 (1988) (emphasis added); *see also* Md.Bus.Reg.Code Ann. § 14–227 (1992). Thus, it is clear that upon the happening of either circumstance in § 365(a), the franchise agreement is rendered merely *voidable*, not void *ab*

*initio. See also Bagel Enters., Inc. v. Baskin & Sears,* 56 Md.App. 184, 198–200, 467 A.2d 533 (1983), *cert. denied,* 299 Md. 136, 472 A.2d 999 (1984).

It was nearly eighteen months after the parties entered into the Agreement when Appellants sent the August 14, 1989 letter by which they purportedly rescinded the Agreement. Whether this was an effective rescission and whether the trial court may order Coverall to rescind the Agreement are not "threshold issues" that the court must first decide. If the Agreement had been illegal, *i.e.,* void *ab initio,* the result might be different. *See Borck v. Holewinski,* 459 So.2d 405 (Fla.Dist.Ct.App.1984) (trial court must make an initial finding as to whether a *prima facie* case is made to support a claim for "true" rescission, which would render the contract, including the arbitration clause, abrogated and of no force and effect *from the beginning* ). Our conclusion is also supported by the parties' express intent in Paragraph 11 of the Agreement. That paragraph clearly provides that Appellants' obligations under the Agreement, including the obligation to arbitrate disputes, survive termination of the Agreement for any reason.

If we were to adopt Appellants' position, any party to a contract containing an arbitration agreement could attempt to avoid the binding nature of the arbitration agreement by merely alleging that the formation of the entire contract was faulty. Such a rule of law would wreak havoc on well-settled principles of arbitration law. The Legislature clearly intended that only issues relating to the existence of the arbitration agreement, and not the underlying contract, be decided by the trial court in the first instance.

## II

Article 56, § 346 of the Annotated Code of Maryland (1988) provided:

(a) The General Assembly finds and declares that the widespread sale of franchises and distributorships is a relatively new form of business which has created numerous problems both from an investment and a business point of

view in this State. Franchisees and distributees have suffered substantial losses when the franchisor, distributor or his representative has not provided full and complete information regarding the franchisor-franchisee relationship, the details of the contract between franchisor and franchisee or distributor and distributee, and the prior business experience of the franchisor, distributor, or his representative.

(b) It is the intent of this subtitle to provide each prospective franchisee or distributee the information necessary regarding franchises or distributorships being offered. Further, it is the intent of this subtitle to prohibit the sale of franchises if the sale would lead to fraud or a likelihood that the franchisor's or distributor's representations would not be fulfilled, and to protect the franchisor or distributor and franchisee or distributee with regard to their business relationship.

*See also* Md.Bus.Reg.Code Ann. § 14–202 (1992).

 Appellants argue that the legislative purpose underlying the Maryland Franchise Act would be best served if the courts, rather than arbitrators, enforce its various provisions. Specifically, Appellants claim that

[b]y deferring jurisdiction over this matter to an arbitrator, and by failing to exercise its statutory authority under the Maryland Franchise Act, the trial court has set a dangerous precedent which numbs the teeth of the Maryland Franchise Act. Because of the superior bargaining power and knowledge possessed by the franchisor, the franchise agreement in this case contains a common clause intended to bypass the laws of the franchisee's home state; namely, that the agreement shall be governed by and interpreted under the laws of the State of California. Based on this provision, an unsophisticated arbitrator, untrained in the law, may decide to apply California and not Maryland law to this transaction, and ultimately enforce an agreement which is invalid and illegal under Maryland law.

We agree that, under the Maryland Franchise Act, courts of this State should *ordinarily* undertake to determine the validi-

ty of a franchise agreement when that issue is in dispute. In this case, however, Appellants voluntarily agreed to arbitrate disputes arising out of the Agreement. When parties enter into such an arbitration agreement, the focus changes: what was an issue for the court is transformed into an issue for arbitration.

If this Court were to hold that the issues regarding rescission of the Agreement must be decided by the trial court in the first instance, we would frustrate the legislative policy favoring enforcement of executory agreements to arbitrate. Further, such a holding would thwart the parties' clear intent that "[a]ny claim or controversy arising out of or relating to th[e] Agreement or the breach thereof shall be settled by arbitration" and that "[t]he termination of th[e] Agreement for any reason shall not be deemed to release the Franchisee from ... such other obligations as set forth [t]herein." Arbitrators are in as good a position as the trial courts to enforce the Maryland Franchise Act and make whatever orders or awards, or both, that are permitted under the law and appropriate under the facts and circumstances of the case. To the extent an arbitrator could misapply the law, that is a risk both parties took when they agreed to arbitrate disputes. Of course, in the proper case, an aggrieved party could petition the court to vacate the arbitration award based upon grounds set forth in CJ § 3–224(b).

**JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.**