534

649 A.2d 365

**Ronald T. HOLMES et al.**

v.

**COVERALL NORTH AMERICA, INC. et al.**

**No. 10, Sept. Term, 1994.**

Court of Appeals of Maryland.

Nov. 4, 1994.

Eliot G. Striar, Columbia, for petitioner.

C. Torrence Armstrong (Frederick P. Helm, McGuire, Woods, Battle & Boothe, Alexandria, VA, Morton A. Sacks, McGuire, Woods, Battle & Boothe, Baltimore, all on brief), for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

In this appeal, we are called upon to determine whether a claim for breach of contract damages based on fraudulent inducement and violations of the Maryland Franchise Registration and Disclosure Act may be resolved in court rather than submitted to an arbitrator, as required by an arbitration clause contained in the franchise contract.

## I.

The underlying dispute in this case involves the validity of an arbitration clause in a franchise agreement between Ronald T. Holmes ("Holmes"), Holmestar Corporation ("Holmestar"), and Coverall North America, Inc. ("Coverall"). Coverall is a janitorial supplies franchise with its principal place of business in California. In October of 1987, Holmes sought information

from Coverall after seeing an advertisement for Coverall franchises. After receiving this information, Holmes engaged in prolonged discussions with Alex Roudi,[1] who was the sole stockholder, director, president, and chief financial officer of Coverall.

On February 22, 1988, Holmes signed a franchise agreement for a Coverall franchise. Paragraph 20 of the franchise agreement contained a broad arbitration clause which stated:

> "Any claim or controversy arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration, in accordance with the rules then prevailing of the American Arbitration Association."

Although operations of the Holmes's franchise were to begin on May 23, 1988, the site was not ready on time and the opening was delayed until July 1, 1988. On July 12, 1988, while Roudi was in Baltimore training Holmes in the franchise operations, Roudi represented to Holmes that, because of the delayed opening, a new franchise agreement should be signed to ensure that billing arrangements under the franchise agreement began at the proper time. Based on Roudi's representations, Holmes signed a second franchise contract on July 12, 1988 which Roudi dated May 12, 1988. Although Holmes alleged that the second contract contained material alterations from the first contract, the arbitration clause was identical to the arbitration clause in the February 22, 1988 franchise contract. Approximately one year after having signed the second franchise agreement and commencing franchise operations, Holmes discovered that Coverall had not, at the time Holmes signed the first franchise contract, been authorized under Maryland law to sell franchises.

Under the Maryland Franchise Act, Maryland Code (1957, 1988 Repl.Vol.), Article 56, §§ 345 *et seq.* (now entitled the Maryland Franchise Registration And Disclosure Law and codified in Md.Code (1992, 1994 Cum.Supp.), Business Regula-

---

1. Alex Roudi's real name is Shahyar Alex Zayanderoudi. He uses the name "Alex Roudi".

tion Art., §§ 14–201 *et seq.*),[2] Coverall was required to obtain approval of its offering prospectus by the Maryland Securities Commissioner in order to be authorized to sell franchises in Maryland. This approval was not received by Coverall until May 6, 1988 and Coverall was therefore not registered to sell franchises in Maryland at the time the first franchise contract was entered into. Nonetheless, Holmes continued to carry on franchise operations and did not seek a rescission of the contract. On August 3, 1989, Coverall informed Holmes that the franchise agreement was terminated due to Holmes's alleged mismanagement and his default under the agreement. On August 14, 1989, after receiving Coverall's termination letter, Holmes and Holmestar informed Coverall by letter that because of violations of the Franchise Act, they were rescinding the franchise agreement.

Petitioners Holmes and Holmestar subsequently filed a complaint in the Circuit Court for Howard County against Coverall, Roudi, their attorney and other officers, directors and employees of Coverall. The complaint alleged various violations of the Franchise Act, fraud in the inducement, negligent misrepresentation, and professional malpractice, and sought punitive and compensatory damages. Coverall subsequently filed a petition for arbitration and for a stay of Holmes's action pending arbitration. The petition for a stay pending arbitration was granted.

Holmes and Holmestar then filed an appeal of the stay pending arbitration to the Court of Special Appeals. Coverall filed a motion to dismiss the appeal, arguing that the trial court's order granting a stay pending arbitration was not a final appealable order. The Court of Special Appeals granted Coverall's motion to dismiss the appeal by order dated April 17, 1992. We then granted Holmes's petition for certiorari, vacated the order of the Court of Special Appeals and remanded the case to that court for consideration of the appeal on the

---

**2.** Unless otherwise specified, all references to §§ 345 *et seq.* are to the Maryland Code (1957, 1988 Repl.Vol.), Art. 56.

merits. *See Holmes v. Coverall North America*, 330 Md. 114, 622 A.2d 744 (1993) (per curiam).

On remand, the Court of Special Appeals heard argument and rejected Holmes's contention that rescission of the contract was a threshold issue to be resolved by the court prior to arbitration. It affirmed the trial court's order for arbitration and stay of the action. *See Holmes v. Coverall*, 98 Md.App. 519, 526, 633 A.2d 932, 935 (1993), *cert. granted*, 334 Md. 263, 638 A.2d 778 (1994). In so doing, the Court of Special Appeals relied on the Maryland Uniform Arbitration Act (Maryland Arbitration Act), Maryland Code (1974, 1989 Repl.Vol.), Courts and Judicial Proceedings Article, §§ 3–201 *et seq.*[3] *Holmes*, 98 Md.App. at 526, 633 A.2d at 935. Section 3–206(a) of the Maryland Arbitration Act states:

"A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract."

Section 3–207(b) of the Maryland Arbitration Act provides that where a party opposing an order to arbitrate denies the existence of an arbitration agreement, "the court shall proceed expeditiously to determine if the agreement exists." In making such a determination:

"If the court determines that existence of the arbitration agreement is in substantial and bona fide dispute, it shall try this issue promptly and order a stay if it finds for the petitioner. If the court finds for the adverse party, it shall order the parties to proceed with arbitration."

§ 3–208(c).

Recognizing the strong legislative policy of the Maryland Arbitration Act to enforce valid arbitration agreements, the

---

**3.** Unless otherwise specified, all references to §§ 3–201 *et seq.* are to the Maryland Code (1974, 1989 Repl.Vol.), Courts and Judicial Proceedings Article.

Court of Special Appeals noted that in a suit to compel arbitration, the court's function is:

> " 'the resolution of a single issue—is there an agreement to arbitrate the subject matter of a particular dispute. Where the language of the arbitration clause is clear, and it is plain that the dispute sought to be arbitrated falls within the scope of the arbitration clause, arbitration should be compelled.' "

*Holmes,* 98 Md.App. at 525–26, 633 A.2d at 935 (quoting *Gold Coast Mall, Inc. v. Larmar Corp.,* 298 Md. 96, 104, 468 A.2d 91 (1983) (citations omitted)). Thus, the court noted that, in determining whether an agreement to arbitrate exists, the dispute often falls into two categories:

> "(1) issues relating to the formation of the arbitration agreement, which should be decided by the court, such as a claim of novation, or an allegation that the agreement is void for lack of mutual consent . . .; and,
>
> (2) issues arising after the formation of the arbitration agreement, which should be referred to arbitration, such as rescission, fraud in the inducement, waiver, and termination of the contract."

*Holmes,* 98 Md.App. at 530, 633 A.2d at 937 (citing *Goebel v. Blocks & Marbles Brand Toys, Inc.,* 568 N.E.2d 552 (Ind.Ct. App.1991)).

The intermediate appellate court noted that under § 365(b) of the Franchise Act, if violations of § 365(a) of the Franchise Act are found, "[t]he court may order the franchisor or subfranchisor to rescind any franchise and to make restitution . . . ." 98 Md.App. at 531, 633 A.2d at 938 (citing § 365(b)) (emphasis omitted). Thus, the contract in question was voidable and not void *ab initio.* 98 Md.App. at 531–32, 633 A.2d at 938. The court noted that an order of arbitration was proper because the petitioners' claims were not threshold issues, but rather "relate[d] to events *extrinsic* to the formation of the contract; the parties to the Agreement clearly intended that the arbitration clause apply to the Appellants' claims for

rescission ... and damages." 98 Md.App. at 531, 633 A.2d at 937 (emphasis in original). The court stated that:

"If we were to adopt Appellants' position, any party to a contract containing an arbitration agreement could attempt to avoid the binding nature of the arbitration agreement by merely alleging that the formation of the entire contract was faulty. Such a rule of law would wreak havoc on well-settled principles of arbitration law. The Legislature clearly intended that only issues relating to the existence of the arbitration agreement, and not the underlying contract, be decided by the trial court in the first instance."

98 Md.App. at 532, 633 A.2d at 938.

We granted certiorari to address the issue of whether allegations of fraudulent inducement and violations of the Franchise Act in a franchise agreement containing a broad arbitration clause are sufficient to permit the franchisee to avoid arbitration of the dispute.

## II.

The Maryland Arbitration Act has been called the "State analogue ... to the Federal Arbitration Act." *See Regina v. Envirmech,* 80 Md.App. 662, 667, 565 A.2d 693, 696 (1989). The same policy favoring enforcement of arbitration agreements is present in both our own and the federal acts. *Compare Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983) (noting the "liberal federal policy favoring arbitration agreements") *with Gold Coast Mall,* 298 Md. at 103, 468 A.2d at 95 (noting the "legislative policy favoring enforcement of executory agreements to arbitrate"). We therefore rely on decisions interpreting the Federal Arbitration Act in reaching our decision.

In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the Supreme Court held that where a party opposes a motion for arbitration based on allegations that there was fraud in the inducement of the entire contract, the issue is one for an arbitrator, not a

court. 388 U.S. at 406, 87 S.Ct. at 1807, 18 L.Ed.2d at 1278–79. In *Prima Paint,* Flood & Conklin Mfg. Co. entered into a consulting agreement with Prima Paint. Pursuant to the agreement, Prima Paint was to purchase Flood & Conklin's paint business and Flood & Conklin agreed to provide consulting to Prima Paint regarding the formulation and manufacturing of paint, as well as other trade information, for a specified number of years. 388 U.S. at 397, 87 S.Ct. at 1802, 18 L.Ed.2d at 1273–74. The contract contained an arbitration clause virtually identical to the arbitration clause at issue here, which stated:

"Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the rules then obtaining of the American Arbitration Association."

388 U.S. at 398, 87 S.Ct. at 1803, 18 L.Ed.2d at 1274.

Prima Paint did not make its first payment under the agreement. Later, Prima Paint paid the amount due, but made the payment into escrow, notifying Flood & Conklin that it felt that Flood & Conklin had broken the agreement in several respects. Prima Paint argued that Flood & Conklin had fraudulently represented its solvency when in fact it was insolvent and preparing to file for bankruptcy shortly after the execution of the agreement. Flood & Conklin promptly filed a notice of intention to arbitrate. Prima Paint then filed suit in the United States District Court for the Southern District of New York seeking rescission of the agreement based on fraudulent inducement. Prima Paint also petitioned for an injunction against arbitration and Flood & Conklin cross-petitioned for a stay of the action pending arbitration. 388 U.S. at 399, 87 S.Ct. at 1803, 18 L.Ed.2d at 1274. The district court granted Flood & Conklin's petition for a stay pending arbitration and the United States Court of Appeals for the Second Circuit dismissed Prima Paint's appeal. 388 U.S. at 399, 87 S.Ct. at 1803–04, 18 L.Ed.2d at 1275.

On appeal, the Supreme Court considered the policies set forth under the Federal Arbitration Act of 1925 in determining whether a federal court or an arbitrator is to hear a claim of fraud in the inducement of an entire contract. The Court noted that § 4 of the Federal Arbitration Act provided that:

> " 'The Court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration. . . .' " [4]

388 U.S. at 403 n. 11, 87 S.Ct. at 1806 n. 11, 18 L.Ed.2d at 1277 n. 11 (quoting § 4 of the Federal Arbitration Act). Thus, the Court held that:

> "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally. * * * [A] federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In so concluding, we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts." (Internal footnotes omitted).

388 U.S. at 404, 87 S.Ct. at 1806, 18 L.Ed.2d at 1277.

The reasoning behind *Prima* and its federal and state progeny [5] is that the arbitration clause is a severable part of the contract. *See, e.g., Prima,* 388 U.S. at 402, 87 S.Ct. at 1805, 18 L.Ed.2d at 1276–77; *Coleman v. National Movie-*

---

**4.** Section 3–207 is Maryland's counterpart to § 4 of the Federal Arbitration Act. *See Regina v. Envirmech,* 80 Md.App. 662, 669, 565 A.2d 693, 697 (1989).

**5.** For an excellent discussion of those jurisdictions following the rule as set forth in *Prima, see* Jay M. Zitter, Annotation, *Claim of Fraud in Inducement of Contract as Subject to Compulsory Arbitration Clause Contained in Contract,* 11 A.L.R.4th 774 (1982).

*Dine, Inc.,* 449 F.Supp. 945, 948 (E.D.Pa.1978); *Flower World of America, Inc. v. Wenzel,* 122 Ariz. 319, 321, 594 P.2d 1015, 1017 (App.1978); *Pinkis v. Network Cinema Corporation,* 9 Wash.App. 337, 512 P.2d 751, 757 (1973). Where there are no allegations of fraud in the making of the agreement to arbitrate, the agreement to arbitrate stands apart from other allegations of infirmities in the contract. Thus, the *Pinkis* court noted that:

> "Agreements to arbitrate are separable from the contracts in which they are placed unless the parties have expressed a contrary intention. Therefore, when a broad arbitration clause is adopted evidencing an intent to arbitrate all disputes between the parties, issues relating to the negotiation and making of the contract, such as fraudulent inducement, are referable to arbitration, unless the arbitration clause itself was improperly transacted."

512 P.2d at 757.

In holding that an arbitration agreement is a severable portion of a contract, these cases treat the mutual promises to arbitrate as an independently enforceable contract. The parties have exchanged mutual promises to arbitrate disputes under the contract and each promise provides consideration for the other. As the Second Circuit noted in *Robert Lawrence Co. v. Devonshire Fabrics, Inc.,* 271 F.2d 402, 411 (2d Cir.1959), generally, "the mutual promises to arbitrate would form the quid pro quo of one another and constitute a separable and enforceable part of the agreement." The court must determine that there are no infirmities in the formation of the arbitration agreement itself; that is, that there is a mutual exchange of promises to arbitrate. Once a court determines that the making of the agreement to arbitrate is not in dispute, its inquiry ceases, as the agreement to arbitrate has been established as a valid and enforceable contract. *See Prima,* 388 U.S. at 403, 87 S.Ct. at 1806, 18 L.Ed.2d at 1277 (noting that § 4 of the Federal Arbitration Act requires the court to be satisfied that the making of the arbitration agreement is not in issue and to enforce arbitration when there is no such issue). *Cf., Hull v. Norcom, Inc.,* 750 F.2d 1547, 1550

(11th Cir.1985) (refusing to enforce arbitration clause in case alleging fraud in the inducement of a contract because the unilateral ability of one of the parties to bring certain claims in court, while the other party was forced to arbitrate all claims, evidenced insufficient consideration to support the validity of the arbitration clause).

■ Our decisions, and those of the Court of Special Appeals, are consistent with the notion that an arbitration clause is a severable contract which is enforceable independently from the contract as a whole. *See Crown Oil v. Glen,* 320 Md. 546, 578 A.2d 1184 (1990); *Regina v. Envirmech,* 80 Md.App. 662, 565 A.2d 693 (1989); *Security Constr. Co. v. Maietta,* 25 Md.App. 303, 334 A.2d 133 (1975); *Bel Pre Med. v. Frederick Contr.,* 21 Md.App. 307, 320 A.2d 558 (1974). In *Crown Oil,* we held that under the Maryland Arbitration Act, the sole question before the court in an action to compel arbitration is whether an agreement to arbitrate exists. 320 Md. at 557, 578 A.2d at 1189. We further noted that, given the strong legislative policy in favor of enforcement of valid arbitration agreements, where there is a broad arbitration clause, even when the issue of arbitration of the particular dispute is unclear, "the Court should promote the legislative policy favoring arbitration and leave the issue of arbitrability to the arbitrators." 320 Md. at 560, 578 A.2d at 1190. Thus, we treated the issue of the validity of an arbitration agreement in a contract as separate from the merits of a dispute under such a contract. *See also Regina,* 80 Md.App. at 674, 565 A.2d at 699 (the claim as to the subcontract's validity is an issue to be decided by the arbitrator); *Security Constr.,* 25 Md.App. at 307, 334 A.2d at 136 (in which the Court of Special Appeals cited *Prima* and held that an argument of fraud in the inducement of the entire contract is one for the arbitrator).

■ Our view that an arbitration clause is severable from the entire contract is further supported by the language of Maryland's Arbitration Act. Section 3–207 states:

"(b) *Denial of existence of arbitration agreement.*—If the opposing party denies existence of an arbitration

agreement, the court shall proceed expeditiously to determine *if the agreement exists.*

(c) *Determination by court.*—If the court determines that the agreement exists, *it shall order arbitration.* Otherwise it shall deny the petition. (Emphasis added)."

Section 3–208 further provides:

*"Determination of existence of arbitration agreement.*—If the court determines that existence of the arbitration agreement is in substantial and bona fide dispute, it shall try this issue promptly and order a stay [of arbitration] if it finds for the petitioner. If the court finds for the adverse party, it shall order the parties to proceed with arbitration."

Thus, the Maryland Arbitration Act provides that, in adjudicating a petition for an order of arbitration or a stay pending arbitration, the consideration of the existence of an arbitration agreement is severable. The scope of the court's involvement extends only to a determination of the existence of an arbitration agreement. The narrow scope of the court's involvement follows from our recognition of the legislative intent to favor arbitration. *See Crown Oil,* 320 Md. at 558, 578 A.2d at 1189 ("Maryland courts have consistently stated that the [Maryland Arbitration] Act embodies a legislative policy favoring the enforcement of executory agreements to arbitrate."). *See also Gold Coast Mall,* 298 Md. at 103, 468 A.2d at 95; *Aetna Cas. & Sur. v. Ins. Comm'r,* 293 Md. 409, 421, 445 A.2d 14, 19 (1982).

In the present case, there has been no allegation that Holmes was fraudulently induced into agreeing to arbitrate disputes or that the parties did not agree to arbitrate this type of dispute. Rather, Holmes's allegations go to the validity of the contract as a whole. These claims run to the merits of the dispute between the parties and do not suggest a "substantial and bona fide dispute" as to the actual existence of an arbitration agreement between the parties. Both contracts signed by Holmes included a broad arbitration clause which required arbitration of "[a]ny claim or controversy arising out of or relating to this Agreement or the breach thereof." Thus,

an arbitration agreement exists in the instant case which covers this dispute—one which arises out of or relates to the contracts. Because Holmes has not alleged fraud in the inducement as to the arbitration clause itself or that the parties did not intend to arbitrate this type of dispute, we find that the underlying dispute is one for the arbitrator.

We further reject petitioners' argument that by enforcing the arbitration agreement, we implicitly recognize the validity of the entire contract in question. By enforcing the arbitration clause, we recognize only that the arbitration clause is valid and that the merits of the dispute must be determined by an arbitrator. We agree with the Court of Special Appeals that, under § 365(b) of the Franchise Act, alleged violations of the Act would make the contract at issue merely voidable and not void *ab initio*. *See Holmes*, 98 Md.App. at 531–32, 633 A.2d at 938. As the Court of Special Appeals previously noted in *Bagel Enterprises, Inc. v. Baskin & Sears*, 56 Md.App. 184, 201 n. 5, 467 A.2d 533, 542 n. 5 (1983), *cert. denied*, 299 Md. 136, 472 A.2d 999 (1984), violations of the Franchise Act render a contract merely voidable. Additionally, other courts have held that allegations that a contract was induced by fraud make the contract voidable rather than void. *See, e.g., Pinkis*, 512 P.2d at 754. By enforcing the arbitration agreement, we merely hold that the mutual promises to arbitrate constitute a separate agreement contained in the contract in question and that the arbitration clause itself is not in dispute. The validity of the contract as a whole is a question left for the arbitrators.

### III.

We do not feel that a resolution of the present issue depends in any way on the fact that the contract in question is regulated by the Franchise Act. Petitioners contend that the strong policy of the Franchise Act must take precedence over the policy of the Maryland Arbitration Act and that arbitration of the dispute in the instant case would contravene the aims of the Franchise Act. We disagree.

We note that other jurisdictions, both state and federal, have found no inherent conflict in enforcing a broad arbitration clause in circumstances virtually identical to those in the present case. These cases have enforced arbitration clauses contained in franchise and distributorship agreements despite allegations both of fraud in the inducement of the contract as well as allegations of violations of the jurisdiction's franchise and consumer regulations. *See, e.g., Barron v. Tastee Freez Intern., Inc.,* 482 F.Supp. 1213, 1216–17 (E.D.Wis.1980); *Coleman,* 449 F.Supp. at 948; *Flower World,* 594 P.2d at 1019–20; *Pinkis,* 512 P.2d at 757; *Cooper v. Computer Credit Systems, Inc.,* 40 A.D.2d 692, 336 N.Y.S.2d 380, 382 (1972). In *Pinkis,* the franchisee brought suit, alleging both fraudulent inducement and violations of the Washington Franchise Investment Protection Act. 512 P.2d at 753. The *Pinkis* court found that the dispute was subject to an arbitration clause contained in the franchise contract. In so finding, the court noted:

" 'Surely there is no public policy that would stand as a bar to an agreement of such obvious utility, as is demonstrated by the facts of this case. The issue of fraud seems inextricably enmeshed in the other factual issues of the case.... Once it is settled that arbitration agreements are "valid, irrevocable, and enforceable" we know of no principle of law that stands as an obstacle to a determination by the parties to the effect that arbitration should not be denied or postponed upon the mere cry of fraud in the inducement, as this would permit the frustration of the very purposes sought to be achieved by the agreement to arbitrate....' "

512 P.2d at 755 (quoting *Robert Lawrence Co.,* 271 F.2d at 410, in turn quoting the Federal Arbitration Act). Similarly, the *Flower World* court stated:

"Applying the principles of those cases [upholding arbitration in claims of statutory violations] to this situation[,] we find no compelling reason for excluding this claim from arbitration. This is essentially a private dispute arising out of a commercial transaction when the parties have agreed how to settle such disputes and involving issues similar to those held arbitrable in *Prima Paint....* The issues to be

arbitrated in the claim are certainly no more extensive or diverse than the issues held to be arbitrable in *Prima Paint,* which, incidentally, involved alleged fraud in connection with the sale of a business."

594 P.2d at 1019.

In addition, other courts have held arbitration clauses enforceable in disputes which centered on other statutory schemes. *See Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 27, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26, 37 (1991) (holding that arbitration of Age Discrimination in Employment Act (ADEA) claims is not inconsistent with the statutory framework of the ADEA); *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 242, 107 S.Ct. 2332, 2346, 96 L.Ed.2d 185, 204 (1987) (holding alleged violations of RICO not exempt from arbitration agreement); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 640, 105 S.Ct. 3346, 3360–61, 87 L.Ed.2d 444, 462–63 (1985) (applying arbitration agreement to allegations of antitrust violations); *United States v. ETS–Hokin Corporation,* 397 F.2d 935, 938 (9th Cir.1968) (upholding arbitrability of a Miller Act dispute); *Fallick v. Kehr,* 369 F.2d 899, 904–05 (2d Cir.1966) (upholding arbitrability of dispute despite application of Bankruptcy Act). These courts have noted that the burden is on the party opposing arbitration to show a clear legislative intent to preclude arbitration of disputes under the particular statutory scheme. *See, e.g., Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652, 114 L.Ed.2d at 37; *Shearson,* 482 U.S. at 227, 107 S.Ct. at 2338, 96 L.Ed.2d at 194. In *Shearson,* the Supreme Court stated:

> "To defeat application of the Arbitration Act in this case, ... the [party opposing arbitration] must demonstrate that [the legislature] intended to make an exception to the Arbitration Act for claims arising under RICO and the Exchange Act, an intention discernible from the text, history, or purposes of the statute."

482 U.S. at 227, 107 S.Ct. at 2338, 96 L.Ed.2d at 194. Thus, to determine if the legislature intended to preclude arbitration as

a forum for providing remedies under the Franchise Act, we must look to the text, history, and purposes of the Franchise Act itself.

Petitioners argue that § 346, which sets out the legislative intent of the Franchise Act, enunciates a specific policy which would be severely limited by arbitrating the present dispute. Section 346 states:

"(a) The General Assembly finds and declares that the widespread sale of franchises and distributorships is a relatively new form of business which has created numerous problems both from an investment and a business point of view in this State. Franchisees and distributees have suffered substantial losses when the franchisor, distributor or his representative has not provided full and complete information regarding the franchisor-franchisee relationship, the details of the contract between franchisor and franchisee or distributor and distributee, and the prior business experience of the franchisor, distributor, or his representative.

(b) It is the intent of this subtitle to provide each prospective franchisee or distributee the information necessary regarding franchises or distributorships being offered. Further, it is the intent of this subtitle to prohibit the sale of franchises if the sale would lead to fraud or a likelihood that the franchisor's or distributor's representations would not be fulfilled, and to protect the franchisor or distributor and franchisee or distributee with regard to their business relationship."

We see nothing inherent in this legislative policy which is inconsistent with the enforcement of a valid arbitration agreement entered into by the parties to a franchise contract. In fact, § 365B of the Franchise Act states that "[t]he powers, remedies, procedures, and penalties provided in this subtitle shall be in addition to, and not in limitation of, any other powers, remedies, procedures, and penalties otherwise provided by law." Thus, because the Maryland Arbitration Act was

in existence prior to the promulgation of the Franchise Act,[6] the language of § 365B of the Franchise Act seems to clearly provide for, rather than eliminate, the ability of parties to agree to arbitrate disputes arising out of contracts that are subject to the Franchise Act. The fact that the Franchise Act sets forth specific penalties and provides for both civil and criminal liability in no way precludes the right of the parties to a contract to agree to utilize arbitration to moderate their disputes.

We also find no indication in the legislative history of the Franchise Act that the legislature intended to preclude arbitration of disputes arising under contracts regulated by the Franchise Act. Absent any legislative intent to preclude arbitration of disputes under contracts governed by the Franchise Act and given the strong legislative policy favoring enforcement of valid arbitration agreements, we find that petitioners have not met their burden of establishing that the legislature intended to make an exception to the Maryland Arbitration Act for claims arising under the Franchise Act.

■ We further find no merit in the petitioners' argument that arbitration is inappropriate because their claims are also against persons who would not be parties to arbitration. In *Chas. J. Frank, Inc. v. Assoc. Jewish Charities*, 294 Md. 443, 450 A.2d 1304 (1982), we recognized several rationales for holding that arbitration agreements should generally be enforced despite the potential for duplicative proceedings. We first recognized that the public policy favoring arbitration would be frustrated if arbitration agreements were not enforced. 294 Md. at 457, 450 A.2d at 1311. Second, we noted that "the enactment of the Uniform Arbitration Act evidences a legislative intent that arbitration not be enjoined to prevent multiplicity of actions." *Id.* Finally, we acknowledged that

---

6. The Maryland Arbitration Act was promulgated in 1965, while the Franchise Act was enacted in 1977. *See* Maryland Uniform Arbitration Act, Maryland Code (1974, 1989 Repl.Vol.), Courts and Judicial Proceedings Article, §§ 3–201 *et seq.;* Maryland Franchise Act, Maryland Code (1957, 1988 Repl.Vol.), Article 56, §§ 345 *et seq.*

"it is unfair to deprive a party to an arbitration agreement of its right to arbitrate when the burden of the potential for duplicative proceedings and inconsistent results was created by the voluntary actions of the party that would bear that burden." 294 Md. at 458, 450 A.2d at 1311. We therefore held that:

> "[o]rdinarily arbitration should not be stayed in order to prevent the prospect for duplicative proceedings with the potential for inconsistent results created by the voluntary actions of a complaining party. We reach this result because it fosters the legislative policy favoring enforcement of executory agreements to arbitrate and is consonant with the legislative policy against enjoining arbitration for the purpose of preventing duplicative, multiple actions. Moreover, to enjoin arbitration under such circumstances is inherently unfair to a party contractually entitled to arbitration." (Internal footnotes omitted).

294 Md. at 459–60, 450 A.2d at 1311–12.

Thus, the involvement in this dispute of persons who would not be parties to arbitration does not preclude the enforcement of the arbitration agreement voluntarily entered into by Holmes, Holmestar, and Coverall. As the First Circuit has pointed out, "[i]f arbitration defenses could be foreclosed simply by adding as a defendant a person not a party to an arbitration agreement, the utility of such agreements would be seriously compromised." *Hilti, Inc. v. Oldach,* 392 F.2d 368, 369 n. 2 (1st Cir.1968); *see also Moses H. Cone,* 460 U.S. at 20, 103 S.Ct. at 939, 74 L.Ed.2d at 782 ("an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement").

In the instant case, an arbitration decision may ultimately foreclose petitioners' claims against the remaining parties. The decision may also serve to clarify and narrow the issues in a subsequent action in court. Even if arbitration does not simplify the dispute among the parties, given our recognition of the importance of enforcing valid arbitration agreements,

we do not feel that the absence of some parties to arbitration would so severely hinder the process of resolving the present dispute or so heavily burden the petitioners that the parties' absence would warrant disregarding the arbitration agreement voluntarily entered into by Holmes, Holmestar, and Coverall.

## IV.

Because petitioners have not contended that the mutual promises to arbitrate were fraudulently induced and because we find no legislative policy in the Franchise Act which is inconsistent with the enforcement of a valid arbitration agreement governed by the Maryland Arbitration Act, we hold that the Court of Special Appeals was correct in upholding the trial court's order of arbitration in the instant case.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS.*