Elizabeth MALONEY–REFAIE,
Plaintiff,

v.

BRIDGE AT SCHOOL, INC., American Contract Bridge League, Inc., American Contract Bridge League Educational Foundation, Barbara Heller, Nadine Wood, Charity Sack and Joan Gerard, Defendants.

C.A. No. 3446–VCL.

Court of Chancery of Delaware.

Submitted: May 29, 2008.
Decided: July 9, 2008.

G. Kevin Fasic, Esquire, Law Offices of G. Kevin Fasic, Wilmington, DE; Christian P. Suprenuk, Esquire, Murland & Associates, LLC, Jenkintown, PA, for the Plaintiff.

Sarah E. DiLuzio, Esquire, Potter Anderson & Corroon, LLP, Wilmington, DE; Hamilton P. Fox, III, Esquire, Tillman J. Finley, Esquire, Sutherland Asbill & Brennan, LLP, Washington, DC, for Defendants Bridge at School, Inc., Barbara Heller, Nadine Wood, Charity Sack, and Joan Gerard.

Louis J. Rizzo, Jr., Esquire, Rochelle L. Gumapac, Esquire, Reger Rizzo & Darnall, LLP, Wilmington, DE, for Defendant American Contract Bridge League Educational Foundation.

Steven T. Davis, Esquire, Obermayer Rebmann Maxwell & Hippel, LLP, Wilmington, DE, for Defendant American Contract Bridge League Inc.

## OPINION

LAMB, Vice Chancellor.

This action involves claims for breach of an employment contract, violation of the Maryland Wage Payment and Collection Law, misrepresentation and fraud, civil conspiracy, unjust enrichment, conversion, and piercing the corporate veil. The plaintiff has named several defendants, including her employer—which is a non-profit organization, the founders of the non-profit organization, a foreign corporation who donated money to the employer, and an affiliate of that foreign corporation. The employer and individual defendants have moved to dismiss the complaint, arguing that the employment contract contains a mandatory arbitration provision. The benefactor corporation filed a separate motion to dismiss, arguing that this court lacks personal jurisdiction over it.

The court concludes that the contract unambiguously requires arbitration of all disputes arising from it. Further, the court lacks personal jurisdiction over the benefactor corporation because the claims against it are unrelated to any acts the corporation took in Delaware.

## I.

### A. The Parties

Defendant American Contract Bridge League, Inc. (the "League") is a New York corporation with its principal place of business in Tennessee. According to its website, the League determines internationally recognized rules for the card game bridge, sanctions clubs and tournament games, and encourages others to learn how to play the game of bridge.[1] Defendant American

---

1. *See* American Contract Bridge League, http://www.acbl.org/about/ourGame.html (last

Contract Bridge League Educational Foundation (the "Foundation") is a charitable trust fund established as a non-profit organization under the laws of Tennessee, and has its principal place of business in Tennessee. Although the record does not contain facts about the legal relationship between the League and the Foundation, it appears that the Foundation is an affiliate of the League created to help the League make grants to programs dedicated to spreading the popularity of bridge.[2]

Defendant Bridge at School, Inc. is a Delaware non-profit corporation with its principal place of business in Maryland. At all relevant times, Bridge at School also had a place of business in Wilmington, Delaware. The individual defendants Barbara Heller, Nadine Wood, Charity Sack, and Joan Gerard are members of Bridge at School's board of directors,[3] and, according to Wood's testimony, Heller, Wood, and Sack founded the corporation.[4] Bridge at School's mission is to teach bridge in schools so that a younger generation of people can learn the game. To help coordinate its activities, Bridge at School employed the plaintiff, Elizabeth Maloney–Refaie, a Delaware citizen.

## B. *Procedural History*

Refaie initially filed this action in Superior Court on December 28, 2005. According to the complaint, on January 1, 2002, Refaie entered into an employment agreement with Bridge at School, signed by Wood as Bridge at School's signatory, making her Bridge at School's "Executive Director." In that capacity, Refaie was to design, develop, and implement a program promoting the game of bridge in various schools, including development of a curriculum for middle school students. In return, Bridge at School allegedly agreed in the employment agreement (1) to pay Refaie a salary of $5,000 per month; (2) to reimburse Refaie for all reasonable business expenses she incurred in the course of performing her duties; (3) to pay Refaie for three weeks of vacation a year, all holidays observed by national banks or the United States Postal Service, and ten sick days per year; (4) to give Refaie thirty days' notice of termination of employment; and (5) to pay Refaie her salary and all expenses incurred through her date of termination.

The complaint alleges that Refaie worked for Bridge at School until February 2, 2003, when she was constructively discharged without the required thirty days' notice. The complaint further alleges that Bridge at School only paid Refaie her salary and expenses through November 30, 2002. According to the complaint, between December 2002 and February 2003, the individual defendants repeatedly asked Refaie to continue working for Bridge at School and represented that Bridge at School would fully perform all of its obligations under the employment agreement. However, Refaie was allegedly never paid the salary, vacation and sick time, or expense reimbursement she claims is due. Additionally, Refaie alleges that the defendants sold, leased, marketed,

visited July 9, 2008).

**2.** *See* ABCL Educational Foundation, http://web2.acbl.org/hosted/edu/page1.htm (last visited July 9, 2008). Apparently, the Foundation is led by a board of nine trustees, three of whom must also be directors of the League. *Id.*

**3.** Bridge at School, Inc. and Indiv. Defs.' Ans. ¶¶ 5–8. At all relevant times, the individual defendants were also members of the League. Wood and Gerard served as representatives on the League's board of directors, and Heller was elected to serve as a "second alternate" to the League's board. *Id.*

**4.** Hr'g Tr. 5–6, Aug. 22, 2006.

licensed and illegally profited from the middle school curriculum she developed. Refaie's complaint asserts causes of action for breach of contract, violation of the Maryland Wage Payment and Collection Law, misrepresentation and fraud, civil conspiracy, unjust enrichment, conversion, and piercing the corporate veil. She seeks approximately $50,000 in damages, as well as interest, costs, attorneys' fees, and punitive damages.

On February 27, 2006, Bridge at School filed a motion to dismiss the Superior Court complaint, arguing that the employment agreement contained a clause requiring the parties to submit to arbitration any disputes arising from the employment agreement, and therefore the court lacked subject matter jurisdiction over the dispute. The Superior Court heard the motion to dismiss on March 21, 2006. At the hearing, Refaie's counsel represented that his client had added language to the employment agreement specifically for the purpose of making arbitration voluntary, rather than mandatory. In response, the Superior Court judge ruled from the bench that the motion would be held in abatement and ordered limited discovery on the issue of the parties' intent in drafting and negotiating the arbitration clause within the employment agreement.

It appears that no discovery was ever taken. Rather, while preparing to begin discovery, Bridge at School found that the document attached to Refaie's complaint differed from the signed copy of the employment agreement existing in its own records. Bridge at School then filed a motion for reconsideration, asking the Superior Court to rescind its discovery order and resolve its motion to dismiss based upon the version of the employment agreement in Bridge at School's possession. The four individual defendants later joined Bridge at School's motion to dismiss and its motion for reconsideration. The Superior Court scheduled an evidentiary hearing for August 22, 2006 to determine which employment agreement was the true and correct copy.

During the August 22 hearing, the Superior Court heard conflicting testimony from Wood and Refaie as to which version of the agreement was the true and correct copy. Noting that the parties may have executed two conflicting agreements, and therefore never had a valid contract, the Superior Court ordered the defendants to answer the complaint and submit to alternative dispute resolution pursuant to Superior Court Rule 16.1.[5] However, the defendants never accepted Refaie's selection of arbitration as the form of alternative dispute resolution, the Superior Court never issued a notice appointing an arbitrator, and it appears that none of the parties took any further steps toward alternative dispute resolution.

On March 29, 2007, the Foundation filed a separate motion to dismiss under Superior Court Rule 12(b)(2), arguing, *inter alia*, that it was not Refaie's employer and therefore not a proper defendant. Following an August 16, 2007 hearing on that motion, the Superior Court found that it did not have jurisdiction to consider Refaie's claim to pierce the corporate veil between the Foundation and Bridge at School. For that reason, by order dated November 5, 2007, the Superior Court transferred the case, in its entirety, to this

---

**5.** Rule 16.1 as it existed at that time provided that all civil actions filed in Superior Court, except for a few specifically identified actions, seeking less than $100,000 in damages were subject to compulsory alternative dispute resolution. *See* Super. Ct. Civ. R. 16.1 (2007). However, the court retained jurisdiction to hear all case dispositive motions, motions to by-pass arbitration, and motions to compel production of medical records. *Id.*

court pursuant to 10 *Del. C.* § 1902. Refaie filed an election of transfer on January 4, 2008, along with a certificate of service that she had served the election on attorneys for the Foundation, Bridge at School, and the individual defendants. Refaie also refiled the complaint with this court on the same day.

Bridge at School and the individual defendants filed a motion to dismiss pursuant to Court of Chancery Rule 12(b)(1) on January 24, 2008, arguing that the employment agreement provides for mandatory arbitration.[6] The remaining defendants did not join that motion or otherwise argue that Refaie was equitably estopped from bringing claims against them outside arbitration.[7] On February 8, 2008, the Foundation filed a motion to dismiss pursuant to Court of Chancery Rule 12(b)(2), arguing that this court lacks personal jurisdiction over it. The Foundation's motion also asserts service of the refiled complaint is inadequate under Court of Chancery Rule 4. On March 14, 2008, the League filed a motion to dismiss pursuant to Court of Chancery Rules 12(b)(5) and 12(b)(6) and an opening brief. Nothing further has been filed in connection with the League's motion.

In her complaint, Refaie claims that the employment agreement provides the parties must proceed to arbitration only if the parties now mutually agree to do so. She also maintains that the court has personal jurisdiction over the Foundation because it (1) is a signatory to the employment agreement; (2) directly employed her; and (3) has no corporate existence separate from Bridge at School. Refaie further claims that service of the compliant was adequate.

## II.

■ Delaware courts apply a two-step analysis to determine whether the exercise of personal jurisdiction over a nonresident is appropriate.[8] First, the court must determine whether "Delaware statutory law offers a means of exercising personal jurisdiction" over the nonresident defendant.[9] Second, after establishing a statutory basis for jurisdiction, the court must determine "whether subjecting the nonresident to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment."[10] The court has discretion to consider evidence outside the pleadings in deciding motions under Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction,[11] and the plaintiff bears the burden of

6. Bridge at School and the individual defendants do not challenge the validity of Refaie's version of the employment agreement at this stage in the litigation. Rather, they assume for the purposes of this motion that Refaie's version is the true and correct version.

7. Cf. *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527–28 (5th Cir.2000) (noting that a nonsignatory may bind a signatory to an arbitration clause in a contract when warranted by the principle of equitable estoppel).

8. See *Amaysing Techs. Corp. v. CyberAir Commc'ns, Inc.,* 2005 WL 578972, at *3 (Del. Ch. Mar. 3, 2005) (citing *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 480 (Del.1992)); *see also AeroGlobal Capital Mgt., LLC v. Cirrus Inds., Inc.,* 871 A.2d 428, 437–38 (Del.2005).

9. *Amaysing Techs.,* 2005 WL 578972, at *3 (citing *Hart Holding Co., Inc. v. Drexel Burnham Lambert, Inc.,* 1992 WL 127567, at *2 (Del.Ch.May 28, 1992)); *see also AeroGlobal Capital,* 871 A.2d at 437–38.

10. *Amaysing Techs.,* 2005 WL 578972, at *3 (citing *Hercules,* 611 A.2d at 481); *see also AeroGlobal Capital,* 871 A.2d at 437–38.

11. *Sloan v. Segal,* 2008 WL 81513, at *6 (Del. Ch. Jan.3, 2008) (citing *Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963, 974 (Del. Ch.2000) (stating that the court is "permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether the defendants are subject to personal jurisdiction")).

making a *prima facie* case establishing jurisdiction over the nonresident.[12]

In this case, Refaie points to 10 *Del. C.* § 3104 as a statutory basis for the exercise of personal jurisdiction over the Foundation. Section 3104 provides that "a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent ... [t]ransacts any business or performs any character of work or service in the State." Courts have read this statute as "confer[ing] jurisdiction to the maximum extent possible under the due process clause."[13] Specifically, "section 3104 provides for personal jurisdiction over a nonresident where (1) the nonresident transacted some sort of business in the state, and (2) the claim being asserted arose out of that specific transaction."[14] "Section 3104 is transactional: even a single transaction may be enough to provide a basis for jurisdiction, but only if the claim asserted relates to that in-state transaction."[15]

Refaie identifies two acts the Foundation allegedly took in Delaware, thereby submitting it to the court's jurisdiction in this case: (1) it was a party to the employ-ment agreement; and (2) it directly employed Refaie in Delaware. Alternatively, Refaie asserts that Bridge at School is the alter ego of the Foundation, and therefore Bridge at School's contacts in Delaware are attributable to the Foundation.

Refaie's argument that the Foundation is a party to the employment agreement is rooted in the agreement's opening sentence, which states "[t]his Employment Agreement (the "Agreement") by and between Bridge At School, Inc., a Delaware non-profit corporation to be formed ("Company"), and Elizabeth Maloney ("Employee") (collectively referred to as the "Parties"), is entered into and effective as of January 1, 2002." Exhibit A to the agreement provides definitions for the contract, and defines "Company" as "Bridge at School, Inc., together with its parents, subsidiaries, affiliates and all related companies, as well as respective officers, directors, shareholders, employees, agents and any other representatives." Refaie points to no facts suggesting the Foundation is a parent, subsidiary, or affiliate of Bridge at School. Rather, her argument appears to be that the Foundation is a "related company," thereby falling under the agreement's definition of "Company,"

**12.** *See Ryan v. Gifford,* 935 A.2d 258, 265 (Del.Ch.2007); *Amaysing Techs.,* 2005 WL 578972, at *3 (citing *Crescent/Mach,* 846 A.2d at 974); *Hart Holding,* 593 A.2d 535, 539 (Del.Ch.1991).

**13.** *Fisk Ventures, LLC v. Segal,* 2008 WL 1961156, at *7 (Del.Ch. May 7, 2008) (citing *Haisfield v. Cruver,* 1994 WL 497868, at *3 (Del.Ch. Aug. 25, 1994)).

**14.** *See* 6 *Del. C.* § 3104(c) ("As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the state...."). Section 3104(c)(4) has sometimes been used as statutory authority for the assertion of "general personal jurisdiction." *See Fisk Ventures,* 2008 WL 1961156, at *7 (noting that section 3104 "authorizes jurisdiction in cases where the defendant (or the defendant's agent) has a 'general presence in the State' ") (citing *Computer People, Inc. v. Best Int'l Group, Inc.,* 1999 WL 288119, at *7 (Del.Ch. Apr. 27, 1999)). To the extent Refaie seeks consideration of the "totality of contacts" the Foundation has with Delaware, the court holds that the Foundation is clearly not subject to general personal jurisdiction. *See id.* at *7 (Del. Ch. May 7, 2008).

**15.** *See Amaysing Techs.,* 2005 WL 578972, at *6 (describing the need under section 3104 to find a "nexus" between the contact with Delaware and the injury alleged).

because the agreement provides that the purpose of Bridge at School is to "further the interests and objectives of the [League]." Refaie concludes that, because Bridge at School falls within the definition of "Company," Bridge at School is a party to the employment agreement.

 To properly analyze Refaie's argument, the court must interpret the employment agreement itself, which provides that it is governed by the laws of the State of Maryland. Thus, Maryland law governs the court's interpretation of the agreement, even though Delaware law governs the procedural aspects of this case.[16] The Maryland Supreme Court recently explained the basic principles of Maryland contract law in *Cochran v. Norkunas:*

> Maryland adheres to the principle of the objective interpretation of contracts. If the language of a contract is unambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation. Thus, our search to determine the meaning of a contract is focused on the four corners of the agreement.

Under the objective theory of contracts, we look at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement. Ambiguity arises if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning.... [W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed.[17]

In addition, in conducting the search for a contract's plain meaning, Maryland courts rely on the "customary, ordinary, and accepted meaning" of the contract's language.[18] Maryland law also recognizes that ascertaining the true meaning of a contract requires construing the contract in its entirety.[19] Further, "if reasonably possible, effect must be given to each clause,"[20] and if a contract is susceptible of two constructions, one of which would produce an absurd result and the other would carry out the purpose of the agreement, the court should adopt the latter construction.[21]

16. Delaware courts generally honor contractually-designated choice of law provisions so long as the jurisdiction selected bears some material relationship to the transaction. *See J.S. Alberici Const. Co. v. Mid–West Conveyor Co.,* 750 A.2d 518, 520 (Del.2000) (citing *Annan v. Wilmington Trust Co.,* 559 A.2d 1289, 1293 (Del.1989)); *see also Postorivo v. AG Paintball Holdings, Inc.,* 2008 WL 343856, at *4 (Del.Ch. Feb. 7, 2008). That standard is clearly met because one of the defendants, Bridge at School, is a corporation with its principal place of business in Maryland. Procedural matters, however, are determined by Delaware law. *See, e.g., Taylor v. LSI Logic Corp.,* 1998 WL 51742, at *4 n. 19 (Del.Ch. Feb. 3, 1998); *Lutz v. Boas,* 176 A.2d 853, 857 (Del.Ch.1961) ("It is well established that the law of the forum governs questions of remedial or procedural law.").

17. 398 Md. 1, 919 A.2d 700, 709–10 (2007) (citations omitted).

18. *Gen. Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 492 A.2d 1306, 1310 (1985) (citation omitted).

19. *Id.; see also Janusz v. Gilliam,* 404 Md. 524, 947 A.2d 560, 569 (2008) (stating that when a court interprets a contract, the court examines the contract as a whole in order to determine the intention of the parties).

20. *Cochran,* 919 A.2d at 710 (citing *Sagner v. Glenangus Farms,* 234 Md. 156, 198 A.2d 277, 283 (1964)).

21. *Born v. Hammond,* 218 Md. 184, 146 A.2d 44, 47 (1958).

Applying these principles, it is clear that the court cannot adopt Refaie's interpretation of the contract. The parties certainly did not intend the agreement to make any company in the least way "related" to Bridge at School a signatory to the agreement, which would lead to the absurd result that a director of the League could be sued for Bridge at School's breach of the agreement. Indeed, neither Bridge at School nor Refaie had any authority to bind other companies or individuals in this way.[22] Rather, it is more reasonable to read the agreement's broad definition of the term "company" as limited to entities having some aspect of shared ownership with or control over Bridge at School. This interpretation is further supported by the fact that, as the opening sentence of the agreement states, the corporate form of Bridge at School was undetermined at the time the parties executed the contract, providing an explanation for the broad definition of the word "Company."

▮ Refaie next argues that the Foundation directly employed her by controlling and directing her work and issuing paychecks directly to her. In support, Refaie submits two of her paychecks, both of which were drawn from the Foundation's bank account, as well as an affidavit in which Refaie avers she was required to provide quarterly updates directly to the Foundation, to review and obtain approval of Bridge at School's budget with the Foundation on a quarterly basis, and to provide the Foundation with updates on the work she did for Bridge at School.[23]

These acts are insufficient to establish the court's jurisdiction over the Foundation. The claims alleged in the complaint are based on Bridge at School's alleged breach of the employment agreement, the individual defendants' alleged misrepresentations and fraud, and the defendants' retention of the middle school bridge curriculum. In contrast, at most, Refaie has alleged that the Foundation indirectly benefited from the employment agreement and, by paying Refaie, performed some of Bridge at School's obligations under it. She has also alleged that the Foundation inquired into how the money was being used. These acts are not related to claims raised in the complaint, and therefore do not provide a basis for personal jurisdiction.[24]

▮ Refaie's claim that Bridge at School was the Foundation's alter ego likewise fails. Under the alter ego theory of personal jurisdiction, "the contacts of an entity with a particular forum can be attributed to another person or entity if the entity having the forum contacts is the mere alter ego of such other person or

---

22. The court also points out that the League and the Foundation are two separate entities, and finds it hard to understand how the Foundation is made a "related company" to Bridge at School simply because the latter is devoted to furthering the interests and objectives of the League.

23. Geoffrey Cross, treasurer of the Foundation, submitted an affidavit stating that the Foundation was unaware of the fact that Refaie received paychecks directly from the Foundation. According to the affidavit, no trustee of the Foundation had signing authority for the Foundation's bank accounts. Rath-

er, the League administered the Foundation's account and wrote checks drawn from the account. Cross also states that the Foundation believed the League made one large payment to Bridge at School, rather than a series of smaller payments to Refaie.

24. Of course, this court would have jurisdiction over the Foundation for claims related to acts it took in Delaware. For instance, the Foundation could be sued in Delaware on these facts for damages if one of its checks bounced.

entity."[25] As the court in *Harco National Insurance Co. v. Green Farms, Inc.* explained:

> [A]n alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functions properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.[26]

In addition, a court may disregard the corporate form "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of the corporation ... are involved."[27]

In support of her claim that Bridge at School is the Foundation's alter ego, Refaie alleges that (1) Bridge at School was reliant upon the Foundation's funds to operate, and had no ability to pay its own bills or control its funds because little, if any, money was ever deposited in its own bank accounts; (2) the Foundation controlled Bridge at School because Gerard and Wood served as advisors to the Foundation's board of trustees, and Heller and

Sack regularly attended meetings of the Foundation's board of trustees; and (3) the Foundation's control over Bridge at School is demonstrated by the fact that Bridge at School submitted the Foundation's financial reports in support of numerous grant applications Bridge at School submitted to third parties.

These facts, without more, fail to establish that Bridge at School is the Foundation's alter ego. Notably, the Foundation and Bridge at School have entirely separate boards and Refaie has not alleged that the Foundation has any ownership interest in Bridge at School. Further, the Foundation does not control Bridge at School. At most, the Foundation can threaten to cease funding Bridge at School if Bridge at School fails to comply with its wishes. Yet at the same time, Bridge at School can seek funding from other organizations. Finally, nothing suggests that the Foundation used Bridge at School's corporate form to perpetrate a fraud. For these reasons, the alter ego theory of jurisdiction provides no basis for this court to find that personal jurisdiction over the Foundation exists in this action.

■ Although it is not necessary to the holding of this case, the court will briefly address the Foundation's argument that service was inadequate under Court of Chancery Rule 4 because Refaie did not serve her complaint on it after electing to transfer this case pursuant to 10 *Del. C.* § 1902. Simply put, a party is not required to refile its complaint after the case

25. Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery, § 3–5[c][1]; *see also* *Sternberg v. O'Neil,* 550 A.2d 1105, 1126 n. 45 (Del.1988).

26. 1989 WL 110537, at *4 (Del.Ch. Sept. 19, 1989).

27. *Pauley Petroleum Inc. v. Cont'l Oil Co.,* 239 A.2d 629, 633 (Del.1968); *Medi–Tec of Egypt*

*Corp. v. Bausch & Lomb Surgical,* 2004 WL 415251, at *7 (Del.Ch. Mar. 4, 2004) (holding that "[f]or this Court to pierce the corporate veil or hold that [a party] is the alter ego ... [the party seeking to pierce the corporate veil] must prove that some 'fraud or injustice' would be perpetrated through misuse of the corporate form").

has been transferred pursuant to 10 *Del. C.* § 1902, much less serve that complaint again on parties that were before the original court. Rather, 10 *Del. C.* § 1902 provides that "[a]ll or part of the papers filed ... and a transcript of the entries, in the court where the proceeding was originally instituted shall be delivered in accordance with the rules or special orders of such court, by the Prothonotary, clerk, or register of that court to Prothonotary, clerk or register of the court to which the proceeding is transferred."

Moreover, section 1902 provides that the latter court "may by rule or special order provide for ... all ... matters concerning the course of procedure for hearing and determining the cause as justice may require," and that "this section shall be liberally construed." Thus, even were the court, in its discretion, to find that in some circumstances a plaintiff was required to serve her complaint again after transfer, that circumstance is not present here. Refaie served her election of transfer on the Foundation on January 3, 2008, thereby

providing notice to the Foundation that the case was to proceed in this court, and the refiled complaint was identical in all material respects to the original complaint filed in Superior Court.

## III.

 Bridge at School argues that this court lacks subject matter jurisdiction because section 19 of the employment agreement mandates arbitration of the claims raised in this action, and Delaware courts lack subject matter jurisdiction over disputes that litigants have contractually agreed to arbitrate. A motion to dismiss based on an arbitration clause is properly brought under Court of Chancery Rule 12(b)(1).[28] The burden of establishing the court's subject matter jurisdiction rests "with the party seeking the Court's intervention."[29] In reviewing the motion, the court may consider documents outside the complaint.[30] For the reasons discussed above, the court applies Maryland law in interpreting the contract.[31] In addition to

28. *Elf Atochem N. Am., Inc. v. Jaffari,* 727 A.2d 286, 287 n. 1 (Del.1999); *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC,* 922 A.2d 417, 429 n. 15 (Del.Ch.2007).

29. *Ropp v. King,* 2007 WL 2198771, at *2 (Del.Ch. July 25, 2007) (citing *Scattered Corp. v. Chicago Stock Exch.,* 671 A.2d 874, 877 (Del.Ch.1994)); *see also Appriva S'holder Litig. Co. v. EV3,* 937 A.2d 1275, 1284 n. 14 (Del.2007) (stating " '[u]nlike the standards employed in Rule 12(b)(6) analysis, the guidelines for the Court's review of [a] Rule 12(b)(1) motion are far more demanding of the non-movant. The burden is on the Plaintiffs to prove jurisdiction exists.' ") (quoting *Phillips v. County of Bucks,* 1999 WL 600541, at *1 (E.D.Pa. Aug. 9, 1999)).

30. *NAMA Holdings,* 922 A.2d at 429 n. 15; *see also Sloan,* 2008 WL 81513, at *6 & n. 25.

31. *See supra* note 17. Also, even though the employment agreement involves an arbitration agreement affecting interstate commerce,

which normally implicates the Federal Arbitration Act, *see* 9 U.S.C. § 1, *et seq,* and its attendant presumption dictating that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), state law applies in this case without any such presumption because the parties dispute the existence of an agreement to arbitrate, rather than the scope of an existing agreement to arbitrate. *See Fleetwood Enters., Inc. v. Gaskamp,* 280 F.3d 1069, 1073 (5th Cir.2002) ("[The] federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties....."); *Int'l Paper Co. v. Schwabedissen Maschinen & Anglagen GMBH,* 206 F.3d 411, 417 n. 4 (4th Cir. 2000) (stating "state law determines questions concerning the validity, revocability, or enforceability of contracts generally, but the Federal Arbitration Act ... create[s] a body of federal substantive law of arbitrability, appli-

the rules of contract interpretation outlined above, the court notes that although Maryland law recognizes that waivers of rights contained within contracts of adhesion are enforced with a degree of special care, Maryland courts have also enforced arbitration provisions found in such contracts.[32]

■ Section 19(b) of the employment agreement states:

Any controversy, claim or dispute arising from, out of or relating to this Agreement, or any breach thereof, including but not limited to any dispute concerning the scope of this arbitration clause, claims based in tort or contract, claims for discrimination under federal, state or local law, and/or claims for violation of any federal, state or local law (any such controversy, claim or dispute being referred to herein as a *"Claim"*), upon [sic] mutual agreement of the parties, shall be resolved in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association then in effect. Such arbitration shall take place in Silver Springs [sic], Maryland. A panel of arbitrators [sic] award shall be final and binding upon both parties.[33]

Section 19 goes on to provide for other rules governing the arbitration process, for example that "demand for arbitration shall be made within a reasonable time after the Claim has arisen," "[e]ach party to the arbitration will be entitled to be represented by counsel and shall have the right to subpoena witnesses and documents," "the arbitration panel shall be experienced in employment arbitration . . . and shall have the authority to hear and grant a motion to dismiss," and that "the prevailing party shall be entitled to receive, in addition to all other relief, payment of all expenses of litigation and arbitration, including attorney's fees." Section 19 concludes with subsection (e), which provides: "The parties indicate their acceptance of the foregoing arbitration requirement by initialing below." Two signature lines, one for Bridge at School and one for Refaie, are provided below this sentence, and each party signed their initials on their respective signature line. Section 19(e), then, appears as follows:

The parties indicate their acceptance of the foregoing arbitration requirement by initialing below:

| /s/NW | /s/EMR |
| --- | --- |
| For the Company | Employee |

At the center of this dispute is the meaning of the phrase "upon mutual agreement" in section 19(b). Bridge at School argues that the court should read the phrase simply as a reference to the

cable to any arbitration agreement within the coverage of the Act") (citations omitted); *Marciano v. MONY Life Ins. Co.*, 470 F.Supp.2d 518, 525–26 & n. 12 (E.D.Pa.2007) (holding that while there is a presumption that a particular dispute is within the scope of an agreement to arbitrate, "the presumption applies only to the scope of an open-ended arbitration agreement, never to the existence of such an agreement or to the identity of the parties who might be bound by such an agreement") (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25, 103 S.Ct. 927); *Heiges v. JP Morgan Chase Bank, N.A.*, 521 F.Supp.2d 641, 645–46 (N.D.Ohio 2007) ("It is well settled that courts should apply state contract law to determine whether a binding agreement to arbitrate exists.") (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)); *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex.2005) ("Generally under the FAA, state law governs whether a litigant agreed to arbitrate, and federal law governs the scope of the arbitration clause.") (citations omitted).

32. *See Walther v. Sovereign Bank*, 386 Md. 412, 872 A.2d 735 (2005); *Doyle v. Fin. Am., LLC*, 173 Md.App. 370, 918 A.2d 1266 (Ct. Spec.App.2007).

33. Compl. Ex. A § 19(b).

initials indicating the parties' assent to the arbitration requirement. Thus, Bridge at School argues, section 19(b) is most accurately read as providing that "as indicated by the initials below, the parties hereby agree that any controversy arising from this Agreement shall be resolved by arbitration in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association then in effect."

Bridge at School also argues that the court should avoid reading the provision as providing for permissive arbitration, *i.e.* that the parties will arbitrate any claims arising from the agreement only if they later agree to do so. In support, Bridge at School cites cases holding that agreements stating parties "may" arbitrate any claims arising therefrom provide for mandatory, not permissive, arbitration.[34] One aspect of the reasoning underlying those cases is that parties can always voluntarily submit a claim to arbitration; therefore, making an agreement to arbitrate only if the par-

ties later agree to do so is a meaningless promise.[35] To avoid this consequence, the cases cited by Bridge at School hold provisions using the term "may" as allowing a party to either arbitrate or abandon the claim. Likewise, Bridge at School argues, a reading of the agreement in this case as providing for permissive arbitration would render it meaningless, and should be avoided.

Refaie responds that the court can read the agreement as providing for permissive arbitration without rendering it meaningless. According to Refaie, section 19 was included to bind the parties to specific rules if and when they later decided to arbitrate.[36] Thus, Refaie argues, section 19(b) is most accurately read as providing that "if, at a later time, the parties mutually agree to arbitrate any controversy arising from this Agreement, that arbitration shall be conducted in accord with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association then in effect." In support,

**34.** *See* Bridge at School, Inc. and Indiv. Defs.' Br. 6–7 (citing *United States v. Bankers Ins. Co.*, 245 F.3d 315, 318 (4th Cir.2001); *Austin v. Owens–Brockway Glass Container, Inc.*, 78 F.3d 875, 879 (4th Cir.1996); *Bonnot v. Congress of Indep. Unions Local # 14*, 331 F.2d 355, 359 (8th Cir.1964); *Deaton Truck Line, Inc. v. Local Union 612*, 314 F.2d 418, 421 (5th Cir.1962); *N.Y. Cross Harbor R.R. Terminal Corp. v. Consol. Rail Corp.*, 72 F.Supp.2d 70, 77 (E.D.N.Y.1998); *McCrea v. Copeland, Hyman & Shackman*, 945 F.Supp. 879, 881–82 (D.Md.1996); *In re Winstar Commc'ns, Inc.*, 335 B.R. 556, 562–64 (Bankr.D.Del. 2005); *TM Delmarva Power, LLC v. NCP of Virginia, LLC*, 263 Va. 116, 557 S.E.2d 199, 201 (2002)).

**35.** *See Bankers Ins. Co.*, 245 F.3d at 318; *Austin*, 78 F.3d at 879 ("If the parties to such an agreement intended for arbitration to be permissive, there would be no reason to include [the arbitration provision], for the parties to an existing dispute could always voluntarily submit it to arbitration."); *Bonnot*, 331

F.2d at 359; *Deaton Truck Line*, 314 F.2d at 421; *N.Y. Cross Harbor RR Terminal*, 72 F.Supp.2d at 77 (reasoning that "[b]ecause parties may always agree to arbitrate a dispute, to interpret an arbitration agreement that uses the term 'may' as permitting rather than mandating arbitration would violate the age-old principle that contracts must not be interpreted so as to render clauses superfluous or meaningless"); *McCrea*, 945 F.Supp. at 881–82; *In re Winstar Commc'ns*, 335 B.R. at 562–64 (Bankr.D.Del.2005); *TM Delmarva Power*, 557 S.E.2d at 201 ("A wholly permissive arbitration provision would be meaningless, and we will not treat a contract provision as meaningless when a reasonable meaning can be given to it.").

**36.** Refaie also alleges that she added the words to the agreement with the express purpose of making arbitration permissive. However, under Maryland law, the court cannot take note of this assertion because the agreement is unambiguous. *See Cochran* 919 A.2d at 709–10.

Refaie cites to an unpublished opinion from the United States Court of Appeals for the Second Circuit, *Bell Atlantic Corporation v. CTC Communications Corporation*,[37] which analyzed an arbitration provision very similar to that in this case. There, the language provided:

> Upon mutual agreement, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, and judgment upon the award may be entered in any Court having jurisdiction thereof.

Like Bridge at School, Bell Atlantic argued that the "upon mutual agreement" language did not render arbitration voluntary, but simply guaranteed that the arbitration clause would not be enforceable until the parties had signed and exchanged the contract. The district court rejected this reading and held that the clause "does not compel arbitration, but rather requires that if the parties agree to arbitrate a dispute, the Rules of the American Arbitration Association will govern the arbitration."[38] It further held that even if the phrase "upon mutual agreement" were ambiguous, under standard contract principles the clause would nevertheless be construed against Bell as the drafter of the contract. The Second Circuit affirmed.

In this case, the court holds that the agreement makes arbitration mandatory. First, section 19(e) provides: "The parties indicate their acceptance of the foregoing arbitration requirement by initialing below." Under Refaie's reading of the agreement, the parties would be indicating their assent merely to certain rules of arbitration should they later agree to arbitrate. The court rejects this reading because it would lead to the odd result that the agreement refers to "the arbitration requirement," but does not actually require arbitration.

Second, it is more reasonable to read the phrase "upon mutual agreement" as referring to the parties' assent to arbitration expressed immediately below on the same page than to a later agreement to arbitrate. One would expect that had the parties intended "upon mutual agreement" to refer to a later agreement, they would have, in light of section 19(e)'s presence, expressed that intent much more explicitly.

For the same reason, the court's reading is consistent with *Bell Atlantic*. There is no indication that the arbitration agreement at issue in *Bell Atlantic* had separate signature lines. As a result, there was nothing in the contract other than the phrase "upon mutual agreement" indicating that the parties meant to reference their agreement at the time of signing the contract. In this case, the separate signature lines make it clear that the parties intended that phrase to refer to the parties' assent to the "arbitration requirement," *i.e.*, the requirement to go to arbitration.[39]

---

37. 1998 WL 536731 (2d Cir. July 2, 1998).

38. *Bell Atlantic*, 1998 WL 536731, at *1.

39. The cases to which Bridge at School cites are not particularly helpful in analyzing the language found in this agreement. First, unlike the alternate reading advanced in those cases, Refaie's interpretation of the phrase "upon mutual agreement" gives independent meaning to section 19(b)—it makes certain arbitration procedures mandatory if the parties ultimately agree to arbitration—while still rendering the initial decision whether to arbitrate voluntary. Second, the conclusion in those cases rested on more than the need to avoid rendering contract language meaningless. Those cases also recognized that use of the word "may" granted one side a right to pursue arbitration if it wished; reading the agreement as providing for mandatory arbitration when one side requested it vindicated

Third, the court's interpretation is consistent with Maryland and federal precedent holding that arbitration agreements are severable and independently enforceable from the contract as a whole.[40] Reflecting this precedent, parties sometimes sign arbitration agreements found in broader agreements independently of and in addition to the broader agreement.[41] The court is unaware of similar precedent applicable to agreements requiring application of specific rules to arbitration should the parties later agree to arbitrate. Thus, the parties here would have little reason to have separate signature blocks for agreements on the rules of arbitration because such provisions have not been held severable and independently enforceable.

## IV.

For the reasons set forth herein, Bridge at School and the individual defendants' motion to dismiss is GRANTED, and American Contract Bridge League Educational Foundation's motion to dismiss is GRANTED. IT IS SO ORDERED.

the rights of that party to unilaterally seek arbitration. *See Conax Florida Corp. v. Astrium Ltd.,* 499 F.Supp.2d 1287, 1297 (M.D.Fla. 2007) (collecting cases and noting that "the word 'may' does not give one party the right to avoid arbitration"); *Hostmark Inv. Ltd. v. Geac Enter. Solutions, Inc.,* 2002 WL 1732360, at *3 (N.D.Ill. July 26, 2002). This consideration is lacking here.

**40.** *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402–03, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (holding that the issue of whether an arbitration clause was obtained by fraud was a claim severable from the issue of whether the contract as a whole was obtained by fraud, and that under the FAA, federal courts have jurisdiction only over the former); *Holmes v. Coverall North Amer., Inc.,* 336 Md. 534, 649 A.2d 365, 370 (1994).

**41.** *See, e.g., Surface Materials Sales, Inc. v. Surface Prot. Indus. Int'l,* 2005 WL 1076377, at *3 (N.D.Ohio May 5, 2005) (refusing to compel arbitration where the parties signed an agreement containing an arbitration clause, but did not initial the separate signature lines provided below that arbitration clause).