EFiled:  Feb 26 2016 04:25PM EST
Transaction ID 58638039
Case No. 11240-VCN

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

February 26, 2016

Robert K. Beste III, Esquire
Smith Katzenstein Jenkins LLP
1000 West Street, Suite 1501
Wilmington, DE  19801

Kenneth J. Nachbar, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE  19801

Re:  *Align Strategic Partners LLC v. Moesser*
C.A. No. 11240-VCN
Date Submitted:  December 1, 2015

Dear Counsel:

Defendant Lane Moesser has moved to dismiss Plaintiff Align Strategic Partners, LLC's ("Align")[1] Complaint on grounds that an arbitration clause requires the parties to resolve their dispute through binding arbitration in Houston, Texas.  In this action, Align seeks, among other relief, a declaration that it validly repurchased Moesser's ownership interest in Align and that Moesser is no longer a member.  A number of agreements between the parties address Align's repurchase

---

[1] Align is a Delaware limited liability company with its principal place of business in Houston, Texas. Verified Compl. ("Compl." or "Complaint") ¶ 1.

right, but only one of them—Moesser's Employment Agreement—contains an arbitration clause. Align disputes this suit's arbitrability by arguing, in essence, that the Employment Agreement is too peripheral to the substance of this dispute for its arbitration clause to apply. Moesser disagrees. For reasons that follow, part of this case is dismissed in favor of arbitration and the remainder is stayed pending the outcome of that proceeding.

\* \* \*

Align is a professional recruiting firm that specializes in placing finance, accounting, and information technology professionals in various positions.[2] Moesser is one of Align's co-founders. On or about September 12, 2011, Moesser became Align's Vice President and came to own a 7.5% ownership interest in Align for which he has paid $63,333.[3] Moesser and Align executed several

---

[2] *Id.*

[3] The purchase price of Moesser's 7.5% interest was $75,000. He paid $40,000 toward that price and executed a promissory note, payable in installments, for the balance. To date, he has paid a total of $63,333 toward the Units' purchase price. *Id.* ¶ 4.

contracts around that time—the Employment Agreement,[4] the Membership Interest Purchase Agreement ("Purchase Agreement"),[5] and the Limited Liability Company Agreement ("Operating Agreement")[6]—that establish these and other rights between the parties.

Each contract listed above contains provisions that address, in varying degrees, Align's ability to repurchase Moesser's 7.5% interest when his employment ends. The Employment Agreement provides for both Moesser's initial purchase of "units of membership interest" ("Units") and Align's option to repurchase those Units later as follows:

> d. Equity Purchase. [Moesser] shall purchase units of membership interest in [Align] upon execution of this Agreement. Units shall be purchased by [Moesser] pursuant to that certain Membership Interest Purchase Agreement attached as Exhibit A to this Agreement. All units of membership interest in [Align] shall be subject to repurchase

---

[4] *Id.* Ex. C (Employment Agreement). The Employment Agreement is dated September 12, 2011 and appears to have been signed by Moesser on the same date.

[5] *Id.* Ex. B (Purchase Agreement). The Purchase Agreement is dated September 12, 2011, and appears to have been signed by Moesser on the same date.

[6] *Id.* Ex. A (Operating Agreement). The Operating Agreement defines its "Effective Date" as September 12, 2011.

by [Align] in accordance with the repurchase provisions included in Exhibit A.[7]

The Purchase Agreement, attached to the Employment Agreement as an exhibit,

provides the following framework for Align's repurchase of Moesser's Units:

4. Repurchase Rights of [Align]. In the event that the Employment Agreement . . . is terminated, then for a period of sixty days following such termination, [Align] shall have the option to repurchase the Purchased Interests from [Moesser], as follows:

a. If the Employment Agreement is terminated by [Align] with Cause, or [Moesser] without Good Reason (as such terms are defined in the Employment [Agreement], then the price [Align] must pay upon the exercise of its option shall be the lower of (a) the price paid by [Moesser] for the Purchased Units as set forth in this Agreement, or the then current Agreed Value of the Purchased Units (as such term is defined in the [Operating Agreement].

b. If the Employment Agreement is terminated by [Align] without Cause, or [Moesser] with Good Reason (as such terms are defined in the Employment Agreement, then the price [Align] must pay upon the exercise of its option shall be the higher of (a) price paid by [Moesser] for the Purchased Units as set forth in this Agreement, or the then current Agreed Value of the Purchased Units (as such term is defined in the [Operating Agreement].[8]

---

[7] Employment Agreement § 2(d).
[8] Purchase Agreement § 4(a)–(b). The original text lacks closing parentheses in both above-quoted subsections.

The Purchase Agreement, however, does not define several terms critical to determining how much Moesser is owed.  The terms "Cause" and "Good Reason" are both defined in the Employment Agreement,[9] and the term "Agreed Value" is defined in the Operating Agreement.[10]  The latter is defined as follows:

> 1.2 <u>Agreed Value</u>. "Agreed Value" shall mean the fair market value of an asset as of the date of valuation, which shall be determined by unanimous agreement of the Members or, if they cannot agree, by an independent appraiser selected by the Board of Managers.[11]

Thus, read in concert, the three agreements define a process for determining how much Align "must pay"[12] Moesser for his Units should it decide to exercise its repurchase option upon termination of Moesser's Employment Agreement.

The termination of Moesser's employment on November 13, 2014, set into motion a months-long dispute over Align's repurchase of Moesser's Units.  After Align's initial efforts to discuss an Agreed Value with Moesser proved unsuccessful, Align decided to move forward with the repurchase using its own

---

[9] Employment Agreement § 5(b).

[10] Operating Agreement § 1.2.

[11] *Id.* The "Board of Managers" is the body charged with "exercis[ing]" "the powers of [Align]" and managing Align's business and affairs. *Id.* § 5.1.

[12] Repurchase Agreement § 4(a)–(b).

valuation.[13]  In a letter dated January 12, 2015 (the "Repurchase Notice"), Align

informed Moesser that it was exercising its repurchase right, that it thought the fair

market value of Moesser's Units was less than the amount Moesser paid for them,

that it had contemporaneously wired $63,333 to Moesser's bank account in

accordance with Section 4(b) of the Purchase Agreement, and that Moesser's rights

with respect to his Units had thereby been extinguished, "effective immediately."[14]

Moesser disputed Align's determination of fair market value and proposed

retaining an independent appraiser.[15]  Align selected an appraiser that in turn

valued Moesser's interest at $42,375.[16]  Moesser disputed and has refused to

recognize this valuation, as well as the Repurchase Notice, the repurchase process,

and the repurchase of his interest in general.[17]  Further, Moesser made a books and

records demand on June 26, 2015.[18]  Align filed this lawsuit a week later alleging

that Moesser breached the Operating Agreement and seeking declarations that

---

[13] *See* Compl. ¶¶ 7, 12; *id.* Ex. D.
[14] *Id.* ¶ 13; *id.* Ex. D (Repurchase Notice).
[15] *Id.* ¶ 14.
[16] *Id.* ¶¶ 15–16.
[17] *Id.* ¶¶ 17, 20.
[18] *Id.* ¶ 18.

Align has purchased Moesser's Units, that Moesser no longer holds any ownership interest in Align, that Moesser is not a member of Align, and that Align has no obligation to respond to Moesser's books and records demand.

\* \* \*

Moesser argues that the following language in the Employment Agreement deprives this Court of subject matter jurisdiction:[19]

> Any dispute or claim arising to or **in any way related to this Agreement** shall be settled by binding arbitration in Houston, Texas . . . . A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter has arisen . . . .[20]

The Employment Agreement is governed by Illinois law.[21]

Generally speaking, under Illinois law, "parties to an agreement are bound to arbitrate only those issues which by clear language and their intentions expressed

---

[19] "A motion to dismiss based on an arbitration clause is properly brought under Court of Chancery Rule 12(b)(1)." *Maloney-Refaie v. Bridge at Sch., Inc.*, 958 A.2d 871, 882 (Del. Ch. 2008); *see also Dresser Indus., Inc. v. Global Indus., Techs., Inc.*, 1999 WL 413401, at \*5 (Del. Ch. June 9, 1999) ("[I]f the claims a plaintiff seeks to litigate in this court are subject to arbitration, this court will dismiss the plaintiff's complaint for lack of subject matter jurisdiction.").

[20] Employment Agreement § 9(h) (emphasis added).

[21] *Id.* § 9(g).

in the language show they have agreed to arbitrate."[22]  So-termed "generic" arbitration clauses—those that are "nonspecific in [their] designation of arbitrable disputes"[23]—will, however, cover disputes "arising under a subsequent agreement . . . as long as the original agreement and the subsequent one concern the same subject matter."[24]  Determining the scope of a generic arbitration clause requires examining "both the wording of the particular clause and the terms of the contract in which it is included."[25]  If this inquiry renders no clear answer, "the question of substantive arbitrability should initially be decided by the arbitrator."[26]

Illinois courts applying this standard have considered a number of contractual features to determine whether two contracts have the same "subject matter."  Unsurprisingly, courts have compared the overall aims of each contract in

---

[22] *Nagle v. Nadelhoffer, Nagle, Kuhn, Mitchell, Moss & Saloga, P.C.*, 613 N.E.2d 331, 334 (Ill. App. Ct. 1993).

[23] *Ozdeger v. Altay*, 384 N.E.2d 82, 84 (Ill. App. Ct. 1978). Arbitration clauses that purport to apply to all claims "arising out of, or relating to" the agreement have been deemed generic.  *Id.* at 83–84; *Nagle*, 613 N.E.2d at 334; *A.E. Staley Mfg. Co. v. Robertson*, 558 N.E.2d 434, 437 (Ill. App. Ct. 1990).

[24] *Nagle*, 613 N.E.2d at 336 (citing *Staley Mfg.*, 558 N.E.2d at 437).

[25] *Staley Mfg.*, 558 N.E.2d at 437; *Ozdeger*, 384 N.E.2d at 84.

[26] *Nagle*, 613 N.E.2d at 337–38 (quoting *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 530 N.E.2d 439 (Ill. 1988)).

search of overlap.[27]  A separate contract's tendency to address one portion of a

broader project contemplated in the contract containing the arbitration clause has

therefore weighed in favor of extending the clause's reach.[28]  Further, courts have

considered the respective contracts' internal structures—in particular, the degree to

which the two contracts overlap with, depend on, or interrelate with, one another.[29]

To that end, the fact that two contracts contained similar provisions and were

---

[27] *See, e.g., id.* at 337 (holding that it was unclear whether two contracts concerned the same subject matter in part because the contract containing the arbitration clause concerned the plaintiff's "rights and obligations as an employee," whereas the contract giving rise to the dispute concerned his "rights and obligations as a shareholder in the firm"); *Staley Mfg.*, 558 N.E.2d at 434–37 (holding that two contracts concerned the same subject matter—"benefits to be afforded the [promisee] in the event of his retirement or termination"—where the first contract entitled the promisee to an initial set of retirement benefits and the second afforded him an additional set); *Ozdeger*, 384 N.E.2d at 82–84 (holding that two contracts concerned the same subject matter—"the construction of plaintiffs' home"—upon observing that the subsequent agreement was "but one phase" of the construction project contemplated in the initial agreement).

[28] *See Staley Mfg.*, 558 N.E.2d at 434–37; *Ozdeger*, 384 N.E.2d at 82–84; *see also Nagle*, 613 N.E.2d at 337 (contrasting the close relationships between the agreements at issue in *Ozdeger* and *Staley Manufacturing* with the somewhat more disjointed relationship between the agreements before the court).

[29] *See Nagle*, 613 N.E.2d at 337; *cf. Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 663 (7th Cir. 2002) (considering internal structure to determine whether one contract's arbitration clause applied to a dispute over another contract under Illinois law without explicitly applying the "subject matter" inquiry Illinois courts have applied to generic arbitration clauses).

"complete on their own" without a need to borrow outside terms has weighed against arbitrability, while a need to read the two contracts "in conjunction" has done the opposite.[30]

These standards guide the Court's present analysis because the Employment Agreement's arbitration clause—which broadly covers "[a]ny dispute or claim arising to or in any way related to" the Employment Agreement—is generic.[31] The Complaint brings two counts and seeks varied relief, but its gravamen is that Align extinguished Moesser's ownership rights when it sent him the Repurchase Notice and wired $63,333 to his bank account. That claim indisputably implicates the Purchase Agreement, which sets forth the repurchase process that Align purported to follow, but does not include an arbitration clause.[32] Accordingly, the question for this Court reduces to whether the Employment Agreement and Purchase Agreement have the same subject matter such that the former's arbitration clause justifiably covers this dispute under Illinois law.

---

[30] *See Rosenblum*, 299 F.3d at 663; *Staley Mfg.*, 558 N.E.2d at 438.

[31] *See* sources cited *supra* note 23.

[32] *See* Compl. ¶¶ 8, 10, 12, 16; Repurchase Notice (claiming that Align was asserting its right to repurchase Moesser's Units under Section 4(b) of the Purchase Agreement).

Side-by-side analysis of the Employment Agreement and Purchase Agreement reveals that the two share the same subject matter for two reasons: (1) they have the same overall aim; and (2) they are structurally interconnected. Following discussion elaborates on each in turn.

First, the Employment Agreement and Purchase Agreement share the same overall aim: establishing Moesser's rights and obligations as an Align employee. Although the Employment Agreement accomplishes comparatively more than the Purchase Agreement in furtherance of that overall effort, that is no reason to deny the Purchase Agreement's functional capacity to serve the same ends.

The idea that the Purchase Agreement is best viewed as a piecewise contribution to the Employment Agreement's broader objectives follows from the Purchase Agreement's failure to contain any rights and obligations associated with the equity purchase outside of those listed within the Employment Agreement itself. Section 2(d) of the Employment Agreement simply provides that Moesser "shall" purchase Units as of the Employment Agreement's execution, those Units "shall" be subject to repurchase by Align, and that this successive purchase and potential re-sale would be governed by the attached Purchase Agreement. The

Purchase Agreement does just that—pours substance into the purchase and repurchase by filling in the practical details of each. But the rest of the Purchase Agreement, which does nothing more than list representations and warranties and address notices that must appear on any certificates, goes no further; it fails to define, for example, Moesser's entitlements and duties as an Align member. The Operating Agreement fills that role.[33] In sum, because the Purchase Agreement only addresses employment-related aspects of Moesser's equity purchase—and at that, only a part of its functionality as compensation[34]—it shares the same aim as the Employment Agreement: defining Moesser's rights and obligations as an Align employee.

---

[33] *E.g.*, Operating Agreement §§ 5.2(d) (providing that certain members have authority to remove individuals from Align's Board of Managers), 6.5 (giving members the right to inspect Align's books and records, subject to certain conditions), 9.1 (providing that certain Operating Agreement provisions shall govern the allocation of Net Profits and Net Losses to members).

[34] Moesser's equity ownership entitles him to forms of compensation not provided for in the Purchase Agreement—including, for example, distributions under article 9 of the Operating Agreement. The Purchase Agreement simply actualizes Moesser's purchase of Units and gives Align the option to repurchase them when Moesser's employment ends.

Second, the Employment Agreement and Purchase Agreement are thoroughly interconnected. Most fundamentally, the Employment Agreement attaches the Purchase Agreement as an exhibit.[35] Aside from that anatomical connection, the Purchase Agreement is an incomplete contract whose provisions cannot be applied without consulting the Employment Agreement. To determine what price Moesser is owed in the event of repurchase under Section 4 of the Purchase Agreement, one must know the meaning of "Cause" and "Good Reason," which are only defined in the Employment Agreement. Further, the two agreements do not contain redundant or conflicting provisions that would otherwise suggest they should be read separately.[36] All of these indicators of

---

[35] *See* Employment Agreement § 2(d).

[36] Align argues that the presence of a merger clause in the Employment Agreement suggests that the parties intended for the Employment Agreement to define "its own subject matter, and *only that subject matter*." Pl.'s Answering Br. Opposing Def.'s Mot. to Dismiss 18; *see also* Employment Agreement § 9(a) ("This Agreement contains the entire agreement of the parties with respect to its subject matter. This Agreement may not be altered, amended or modified except in writing duly executed by both of the parties."). But the presence of this clause arguably goes both ways; the presence of a merger clause in the Employment Agreement but not its attachment could indicate that the both were intended as the parties' full expression of their agreement, especially given that the Purchase Agreement does not have a merger clause that would create a redundancy. Further,

Purchase Agreement's dependence on, and interconnectedness with, the Employment Agreement weigh in favor of arbitrability. These entanglements, considered alongside the two agreements' shared function of defining Moesser's employment rights and obligations, demonstrate that the dispute over the repurchase "relates to" the Employment Agreement under Illinois law.

Align resists this outcome on several grounds that spring from the same basic factual premise: that Moesser both refused to negotiate an agreed price and insisted on using what Align calls a "separate dispute resolution mechanism" contained in the Purchase Agreement to contest Align's valuation instead of commencing with arbitration immediately. This, argues Align, has several important consequences—namely, that (1) Moesser violated the arbitration clause's requirement that any arbitration demand "shall be made within a reasonable time after the claim, dispute or other matter has arisen";[37] and (2) that

---

Align's argument seems to misunderstand the role of merger clauses, which often function to "permit[] either party to invoke the parol evidence rule to exclude evidence of additional contractual terms" mentioned in negotiations or prior contract drafts as expressions of the parties' agreement. *See Rosenblum*, 229 F.3d at 665.

[37] Employment Agreement § 9(h).

the doctrines of estoppel, waiver, and acquiescence preclude Moesser from now raising a demand to arbitrate. Both arguments fail.

Moesser asserted the arbitration clause within a reasonable time frame. The appraiser's valuation is dated June 15, 2015; Align filed the Complaint on July 2, 2015; Moesser was served on July 23, 2013; and Moesser filed this Motion to Dismiss on September 18, 2015. Perhaps Moesser could have commenced arbitration before June 15, 2015, or before this lawsuit commenced. But waiting to do so until after the appraiser's report arrived made sense given the *ex ante* possibility that the independent appraisal would lead to resolution. And once Align filed this lawsuit, it was reasonable for Moesser to delay commencing arbitration in Houston, Texas absent a dismissal or stay from this Court.

Align's equitable defenses do not apply in this case because Moesser did not mislead Align,[38] take action inconsistent with the right to arbitration,[39] or otherwise

---

[38] "Estoppel applies 'when a party by his conduct intentionally or unintentionally leads another, in reliance on that conduct, to change position to h[er] detriment.'" *Bantum v. New Castle Cnty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) (quoting *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990)).

[39] "For a party to be found to have waived its right to arbitrate, it must have actively participated in a lawsuit or taken other action inconsistent with the right to

acknowledge that some distinct "dispute resolution mechanism" governed.[40] The

"mechanism" Align identifies—contained in Purchase Agreement Section 4(b)—

does not purport to prescribe definitively any method for resolving Moesser's

concerns about the appraiser's valuation, Repurchase Notice, repurchase process,

and repurchase of his interest. That provision—and the extra-contractual

definitions it relies upon—instead addresses the narrow question of how to

determine Agreed Value in the event Align's members cannot unanimously agree

on Align's fair market value.[41] Thus, Moesser's proposal to engage an

independent appraiser cannot be deemed an admission or recognition that

arbitration is not warranted.

---

arbitration." *Falcon Steel Co. v. Weber Eng'g Co., Inc.*, 517 A.2d 281, 288 (Del. Ch. 1986).

[40] "Acquiescence arises where a complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable period of time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." *NTC Gp., Inc. v. W. Point-Pepperell, Inc.*, 1990 WL 143842, at *2 (Del. Ch. Sept. 26, 1990).

[41] *See* Operating Agreement § 1.2.

\* \* \*

For all of these reasons, the Employment Agreement's broad, generic arbitration clause justifiably applies to the parties' dispute over the validity of Align's purported repurchase. Determining whether Align effectively bought Moesser's ownership interest will require assessing Align's adherence to a framework set forth in the Purchase Agreement, a document that concerns the same subject matter as the Employment Agreement. That aspect of Align's claims is therefore dismissed in favor of arbitration.[42] The remainder of this action—which concerns Align's request for a declaration that it need not respond to Moesser's books and records demand—is stayed because that claim does not arise under the Purchase Agreement or Employment Agreements and requires a determination as to Moesser's membership status.

---

[42] The Complaint (at paragraph 20) asserts generally that Moesser breached the Operating Agreement, but does not specify which provisions have been breached. The Court is unaware of any aspect of this breach of contract claim that does not concern Moesser's refusal "to recognize the Repurchase Notice, the repurchase process, and the repurchase of [Moesser's] interest"—issues the Court now directs to arbitration.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    Register in Chancery-K